**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 14, 2005**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PATRISHA JONES,

      Plaintiff-Appellant,

v.

DEPUTY R. HUNT, in his individual
and official capacity; THE
SANDOVAL COUNTY BOARD OF
COMMISSIONERS,

      Defendants,

and

ALFRED HABERMAN, in his
individual capacity,

      Defendant-Appellee.

No. 04-2108

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-03-362 JB/LAM)**

---

Jane Gagne, Albuquerque, New Mexico, for Plaintiff-Appellant.

Daniel J. Macke, Brown & German, Albuquerque, New Mexico, for Defendant-Appellee.

---

Before **LUCERO** and **TYMKOVICH**, Circuit Judges, and **BLACKBURN**,[*] District Judge.

_____

**LUCERO**, Circuit Judge.

_____

Patrisha Jones seeks redress under 42 U.S.C. § 1983 for alleged violations of her Fourth Amendment rights arising from her seizure by two New Mexico government officials at the Bernalillo High School where Jones was a student. This appeal relates to the dismissal of one of the two state officials on the basis of qualified immunity. The second official, a deputy sheriff, remains a party in the proceedings below. Jones alleges that Alfred Haberman, a Social Worker Supervisor for the New Mexico Children, Youth, and Families Department ("CYFD"), seized her at her high school with no legitimate justification, demanded that she leave her mother's care, and insisted that she return to her abusive father. Haberman made these alleged demands in the face of an existing court order assigning temporary custody to Jones' mother and forbidding the father from contacting Jones. The district court dismissed her claims against Haberman on the basis of qualified immunity, finding that Haberman's actions did not amount to a seizure and that, even if they did, the law was not clearly established at the time of the incident. Accepting Jones' allegations as true, we

_____

[*] The Honorable Robert E. Blackburn, District Judge, United States District Court for the District of Colorado, sitting by designation.

conclude that Haberman violated Jones' clearly established Fourth Amendment rights and **REVERSE** the district court's order dismissing Jones' suit.

**I**

When reviewing a dismissal pursuant to Rule 12(b)(6), we accept the well-pleaded allegations of the complaint as true and view them in the light most favorable to the plaintiff. See Yoder v. Honeywell Inc., 104 F.3d 1215, 1224 (10th Cir. 1997). Construed in the most favorable light, the complaint reveals the following facts.

Jones' mother and father are not married and have been estranged for some time. Jones had been living with her father for several years when, in the course of an argument, Jones' father and stepmother struck Jones, causing her to sustain cuts on her neck and collarbone and bruising on her face. She was sixteen years old at the time. Because her father is a former police officer and her stepmother is a friend of the county sheriff, Jones was reluctant to report the incident. She did, however, meet with officials at Bernalillo High School to discuss emancipation and revealed the details of the argument during the course of her conversation. As a result of Jones' disclosure, Deputy R. Hunt, a law enforcement officer employed by the Sandoval County Sheriff's Office, was dispatched to the school, apparently pursuant to the New Mexico Abuse and Neglect Act, N.M. Stat. Ann. §§ 32-A-4-1 to 32-A-4-33. He took Jones to the

sheriff's department to meet with social worker Haberman for an investigatory interview. At the conclusion of the interview, the two officials handed Jones over to the custody of her adult sister, where she remained until she moved in with her mother two months later.

Based on the incident of violence, Jones' mother filed for a protective order on her daughter's behalf and obtained, on January 8, 2003, a Temporary Order of Protection and Order to Appear ("TRO") against Jones' father, under the New Mexico Family Violence Protection Act, §§ 40-13-1 to 40-13-8. In the TRO, the state court gave Jones' mother temporary physical custody of Jones and prohibited the father from having contact with Jones until further order of the court. Jones' father was not aware that Jones was living with her mother until receiving the TRO. On the same day that they received the TRO, Jones' father and stepmother met with Deputy Hunt to seek his assistance. Hunt then left that meeting and took social worker Haberman with him to the high school. The two officials confronted Jones and told her, contrary to the terms of the TRO, that she could not live with her mother. They insisted that she either choose to live with her father, again in contravention of the TRO, or move into a shelter.

Having made these demands, the officials left Jones at the high school, at which point she went, panic-stricken, to a school resource officer and stated that if she could not live with her mother she would kill herself. Consequently, the

resource officer referred Jones to a school counselor and she promptly reported to his office. After conducting a risk assessment, the counselor determined that Jones presented a low risk of suicide. Meanwhile, Hunt and Haberman returned to the high school and, upon finding her in the counselor's office, proceeded to threaten and harass her in the presence of the counselor for over two hours. The counselor then left, and the two officials – Hunt in uniform – proceeded to tell Jones for an additional "hour or two" that if she did not return to her father's house, Hunt would arrest her, that her "life would be hell," that Hunt and Haberman would "be [her] shadow until [she was] eighteen, and maybe longer," that they would ensure that her mother was sent to prison, that there was a "zero percent" chance that she would live with her mother, and that when she turned eighteen, she and her mother might be "cell mates." Jones cried throughout the encounter, and alleged that she was "terrified of Hunt and Haberman" and "did not even think of challenging" them.

By prearrangement with Hunt and Haberman, Jones' father and stepmother were waiting at the school. Jones emerged from the counselor's office and, complying with Hunt and Haberman's demands, went to her father's house. The following day, Hunt called Jones' mother and informed her that Jones was now living with her father. He also falsely told Jones' mother that the TRO had been "reversed" and the hearing set for January 22nd was cancelled. Jones' mother

- 5 -

learned subsequently that Hunt had misled her, and she attended the January 22nd hearing, although she did not testify. At this point, the record is unclear as to the result of the January 22nd hearing. The complaint alleges, in somewhat confusing fashion, that the special commissioner declined to "issue a further restraining order." Jones, having contacted attorneys and received assurance that she would not be arrested for refusing to return to her father's home, moved into a youth shelter the evening after the hearing.

Jones later sued Hunt and Haberman under 42 U.S.C. § 1983, claiming a violation of her Fourth Amendment right to be free from unreasonable seizures.[1] On the basis of its conclusion that the altercation in the counselor's office between Jones and the two officials did not amount to an unconstitutional seizure and that, even if it did, Haberman did not violate clearly established law, the district court granted Haberman's motion to dismiss on the basis of qualified immunity. Jones appeals that order.

## II

We review de novo a district court's ruling on qualified immunity. Farmer v. Perrill, 288 F.3d 1254, 1259 (10th Cir. 2002). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v.

---

[1] Not relevant to this appeal, Jones also asserted claims against the Sandoval County Board of Commissioners for failure to adequately supervise and train, and sued all defendants claiming the state tort of false imprisonment.

<u>Forsyth</u>, 472 U.S. 511, 526 (1985). Our threshold inquiry in the qualified immunity analysis is whether, taking Jones' allegations as true, Haberman violated Jones' Fourth Amendment right to be free from unreasonable seizures. <u>Hope v. Pelzer</u>, 536 U.S. 730, 736 (2002). If we conclude that Jones has alleged constitutionally impermissible conduct, Haberman "may nevertheless be shielded from liability for civil damages if [his] actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Id.</u> at 739 (citation omitted).

**A**

Applicable to the states through the Fourteenth Amendment's Due Process Clause, the Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. iv. Because the Amendment focuses on safeguarding persons from unwarranted intrusion, and not on regulating the behavior of particular governmental actors, the prohibition against unreasonable seizures extends to civil, as well as criminal, investigations by the government. See, e.g., <u>Dubbs v. Head Start, Inc.</u>, 336 F.3d 1194, 1206 (10th Cir. 2003) ("The focus of the Amendment is thus on the security of the person, not the identity of the searcher or the purpose of the search."); <u>Marshall v. Barlow's, Inc.</u>, 436 U.S. 307, 312-13 (1978) ("If the government intrudes on a

person's property, the privacy interest suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards."). We have held that the Fourth Amendment subjects state social workers to its requirements. See Dubbs, 336 F.3d at 1205 ("There is no 'social worker' exception to the Fourth Amendment.").

A seizure occurs for Fourth Amendment purposes when "a reasonable person would have believed that he was not free to leave." Michigan v. Chesternut, 486 U.S. 567, 573 (1988). In United States v. Hill, 199 F.3d 1143 (10th Cir. 1999), we identified several factors to guide our determination of whether a person was, in fact, seized. They include:

> 1) the threatening presence of several officers; 2) the brandishing of a weapon by an officer; 3) some physical touching by an officer; 4) use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; 5) prolonged retention of a person's personal effects . . . ; 6) a request to accompany the officer to the station; 7) interaction in a nonpublic place or a small, enclosed place; 8) and absence of other members of the public.

Hill, 199 F.3d at 1147-48. We have refused to treat any of the factors cited above as dispositive. United States v. Glass, 128 F.3d 1398, 1406 (10th Cir. 1997); United States v. Little, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc) ("only in rare instances will any one factor produce an inexorable conclusion that a seizure has occurred."). Nor are these factors exclusive. See United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993) ("we have avoided hard line rules to govern this

analysis, and our opinion today should not be interpreted as an exhaustive pronouncement.").  Rather, we base our Fourth Amendment analysis on the "totality of the circumstances."  United States v. Shareef, 100 F.3d 1491, 1505 (10th Cir. 1996) (citation omitted).  When viewing the totality of the circumstances, it may be that the strong presence of two or three factors demonstrates that a reasonable person would have believed that he was not free to terminate an encounter with government officials.

We must view Jones' encounter with Haberman and Hunt through the eyes of a reasonable sixteen-year-old.  See Little, 18 F.3d at 1505 n.6 ("whether the person being questioned is a child or an adult" is "relevant" to whether a person would have felt free to leave); see also Doe v. Heck, 327 F.3d 492, 510 (7th Cir. 2003) (child "was 'seized' with[in] the meaning of the Fourth Amendment because no reasonable child would have believed that he was free to leave").  Seen from a such a perspective, we are inexorably driven to the conclusion that a reasonable sixteen-year-old would not have felt free to terminate the encounter with Hunt and Haberman.

Jones' encounter with Hunt and Haberman, two government officials, one of whom was in police uniform, took place in a small, confined school counselor's office, to which Jones had been sent by a school official after threatening suicide.  See Hill, 199 F.3d at 1147-48.  Jones was a sixteen-year-old

girl whom these very officials had transported from the high school to the sheriff's department for an investigatory interview two months earlier. She knew that they had the authority to determine her custodial care, as they had previously turned her over to the custody of her older sister. Finding herself alone with these two officials for an "hour or two," Jones endured their repeated threats that if she did not agree to live with her father, they would arrest her and follow her for at least the next two years, ensuring that her "life would be hell." As evidenced by her crying, she was obviously emotionally fragile and distraught. See Little, 18 F.3d at 1505 (A citizen's "subjective state of mind" is relevant "to the extent that [it] may have been known to the officer and influenced his conduct."). An emotionally vulnerable sixteen-year-old would not have felt free to terminate that encounter.

The district court concluded that the threats of arrest did not contribute to the seizure, because "[a]ny compliance Haberman demanded . . . concerned Jones' future living arrangements and did not concern an alleged inability to leave the counselor's office at that moment." Construing the facts in the light most favorable to Jones, the district court's conclusion is incorrect. Jones was living with her mother at the time of the encounter. A reasonable sixteen-year-old would have interpreted Hunt and Haberman's threats to mean that if she did not agree to go home with her father – who was waiting at the school to receive her

following her encounter with Hunt and Haberman – then she would be arrested. Jones reasonably believed that leaving the office, and thus refusing to go home with her father, would result in her arrest.

Additionally, the court below found that Jones went to the counselor's office voluntarily, which "points away from a seizure." This finding is at odds with the allegation in the complaint. Jones claims that the school resource officer referred Jones to the counselor to determine if she were at risk of committing suicide. A reasonable high school student would not have felt free to flaunt a school official's command, leave an office to which she had been sent, and wander the halls of her high school without permission. It is possible that Jones' initial encounter with Hunt and Haberman was consensual. Regardless, it was transformed into a seizure through Hunt and Haberman's alleged threats and demands. See Little, 18 F.3d at1505 ("a consensual encounter between a citizen and police can be transformed into a seizure through persistent and accusatory questioning by police.").[2]

**B**

_____

[2] We need not determine the precise moment in time that a seizure occurred. Although it may have occurred earlier, we are satisfied that after Hunt and Haberman threatened Jones with her own arrest, as well as her mother's arrest, and promised that her "life would be hell" because the two officials would "be [her] shadow until [she was] eighteen, and maybe longer," she was seized.

Our conclusion that the alleged encounter constituted a seizure is but the first part of the constitutional analysis. We must yet determine if the seizure was reasonable, an inquiry that depends on the context in which it took place. New Jersey v. T.L.O., 469 U.S. 325, 337 (1985). With limited exceptions, a search or seizure requires either a warrant or probable cause. Camara v. Municipal Court, 387 U.S. 523, 528-529 (1967) ("except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant."); T.L.O., 469 U.S. at 340-41 ("Ordinarily, a search . . . must be based upon 'probable cause' to believe that a violation of the law has occurred. [However,] we have in a number of cases recognized the legality of searches and seizures based on suspicions that, although 'reasonable,' do not rise to the level of probable cause.").

The court below relied on one such exception recognized by the Supreme Court in T.L.O. In T.L.O., the Supreme Court held that where school officials detain and question a child for the purpose of maintaining or restoring order in the school:

> the accommodation of the privacy interests of schoolchildren
> with the substantial need of teachers and administrators for
> freedom to maintain order in the schools does not require strict
> adherence to the requirement that searches be based on
> probable cause to believe that the subject of the search has
> violated or is violating the law. Rather, the legality of a search
> of a student should depend simply on the reasonableness,
> under all the circumstances, of the search.

T.L.O., 469 U.S. at 341. Adopting the Terry standard, the Court explained that a search of a student by a school official is reasonable if "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." Id. (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)). We have held that "the same considerations which moved the Supreme Court to apply a relaxed Fourth Amendment standard in cases involving school searches support applying the same standard in school seizure cases." Edwards v. Rees, 883 F.2d 882, 884 (10th Cir. 1989) (applying Terry standard where a junior high school vice principal seizes a student to question him about a bomb threat). Therefore, we have held since 1989 that seizures of students by school officials must pass the Terry test.

Because Haberman and Hunt's seizure of Jones took place on public school property, the district court erroneously concluded that the relaxed Fourth Amendment standard announced in T.L.O. should apply to this case.[3] The Supreme Court fashioned a relaxed standard due to its concern about "unduly burden[ing] the efforts of school authorities to maintain order in their schools." T.L.O., 469 U.S. at 342. Because the case before us does not involve efforts by

---

[3] The district court in error applied the relaxed standard when deciding if the altercation constituted a seizure. The relaxed standard announced in T.L.O. and extended by this court in Rees is irrelevant to determining if a seizure occurred, and applies only to an inquiry into the reasonableness of a search or seizure.

- 13 -

school administrators to preserve order on school property, it does not implicate the policy concerns addressed in T.L.O. and therefore does not merit application of the T.L.O. standard.[4]

It is ultimately unnecessary for us to decide what Fourth Amendment test is most appropriate in this case "because the conduct alleged in [this] case would violate the most minimal standard of which we can conceive." Snell v. Tunnell, 920 F.2d 673, 698 (10th Cir. 1990). Even applying the Terry standard – that a seizure must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place" – Haberman violated Jones' Fourth Amendment rights. Terry, 392 U.S. at 20.

Taking the facts as alleged, Haberman's seizure of Jones was not "justified at its inception." Id. The complaint does not allege that Haberman suspected

_____

[4] We do not imply that a social worker investigating allegations of abuse or neglect necessarily requires a warrant, probable cause, or exigent circumstances before questioning a child on public school property. Where a social worker merely conducted an interview of a child at a public school, and thus did not remove the child nor interfere with the sanctity of the private home, we have applied the Terry standard. Doe v. Bagan, 41 F.3d 571, 575 n.3 (10th Cir. 1994). It may be that the Terry standard applies even where a social worker removes a child from her parents' custody at a public school following a legitimate investigation into child abuse and neglect. As discussed, infra, this case presents a unique constellation of alleged facts allowing us to evaluate the claims under the Terry standard without deciding what standard ought to apply in an ordinary removal case.

- 14 -

Jones' mother of abusive or neglectful behavior.[5] On the other hand, there was sufficient evidence of her father's abusiveness to both warrant transfer from his custody (which Haberman himself facilitated two months earlier) and the issuance of a TRO against him.[6] Indeed, Haberman's demand that Jones leave her mother's care and enter her father's custody violated the express terms of the existing TRO. We do not see how a seizure, the alleged intended purpose of which would violate a court order, can possibly be justified at its inception. There was no legitimate governmental interest in this seizure. See Wyoming v. Houghton, 526 U.S. 295, 299-300 (1999) (we may "evaluate the search or seizure under traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."). Where no legitimate basis exists for detaining a child, a seizure is plainly unreasonable. Taking the alleged facts as true, this seizure, which lasted between three to four hours, was unjustified from the beginning, and therefore cannot be said to be "reasonably related in scope to the circumstances which

---

[5] Of course, discovery could develop facts indicating that Haberman had legitimate concerns for Jones' welfare, which would be highly relevant to the constitutional analysis.

[6] According to the complaint, Jones' father had been charged by CYFD with abusing two of his other children, and he lost custody as a result of those charges. Haberman, as an employee of CYFD, allegedly had access to information about these charges before the seizure.

- 15 -

justified the interference in the first place." <u>Terry</u>, 392 U.S. at 20. Even when scrutinized under the minimal requirements of <u>Terry</u>, Haberman's alleged conduct amounts to an unreasonable seizure.

After the defendants have the opportunity to develop the factual record, the picture confronting the court may look very different. Haberman may have had legitimate concerns for Jones' safety and welfare, he may have played a minor role in the encounter and been ignorant of Hunt's motives, and Jones may have consented to the questioning throughout the encounter. Viewing the totality of the circumstances as alleged in the complaint in the light most favorable to Jones, however, we conclude that she has alleged sufficient facts to demonstrate at the 12(B)(6) stage that she was unreasonably seized within the meaning of the Fourth Amendment.

### C

Although his alleged actions, if true, violated Jones' Fourth Amendment rights, Haberman nonetheless gains qualified immunity if his "actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Hope</u>, 536 U.S. at 739 (internal quotation omitted). To defeat a claim of qualified immunity, plaintiffs need not point to a prior holding that the specific conduct at issue is unlawful; rather, the unlawfulness of the alleged action must have been apparent. <u>See</u> <u>id.</u> Moreover, it is incumbent

upon government officials to make "reasonable applications of the prevailing law to their own circumstances." Murrell v. Sch. Dist. No. 1, 186 F.3d 1238, 1251 (10th Cir. 1999).

Without doubt, it was clearly established by January 2003 that a seizure must be reasonable. See, e.g., United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975). In Terry, decided in 1968, the Court instituted the rule that, at minimum, a seizure must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. It was also clearly established by the date of the seizure that the Fourth Amendment's strictures apply to social workers. See, e.g., Malik v. Arapahoe County Dep't of Soc. Servs., 191 F.3d 1306, 1316 (10th Cir. 1999) (holding, in a case involving alleged retaliation, that it was clearly established that a social worker violates the Fourth Amendment by procuring seizure order through material omissions); Snell, 920 F.2d at 697-98 (holding that a social worker violates the Fourth Amendment where there is "evidence indicating deliberate and willful conduct, specifically, that the defendants knew that any allegations concerning child sexual abuse and the Snells were false, yet they persisted in their attempts to intervene on that very basis."). Indeed, in 1994 we applied the Terry standard to a social worker's seizure of a child at a public school. Doe v. Bagan, 41 F.3d at 575 n.3. Finally, the standard by which a court

- 17 -

judges whether a seizure occurred was clearly established. See, e.g., Hill, 199 F.3d at 1147-48.

Therefore, by January 10, 2003, Haberman was on notice that the Fourth Amendment's requirements applied to him, that a seizure would occur within the meaning of that Amendment if at any point the person believed that she was not free to terminate an encounter with him, that the "free to leave" determination would be informed by the Hill factors, and that any seizure of a child at a public school must be justified at its inception. Because Haberman's conduct as alleged constituted a seizure under Hill and was unreasonable under Terry, Haberman violated a clearly established constitutional right of which a reasonable person would have known.

Our conclusion is based on clearly and narrowly articulated Fourth Amendment principles. In Anderson v. Creighton, 483 U.S. at 638-40, the Court expressed its awareness that if alleged at a sufficient level of generality, any constitutional violation would deprive government officials of qualified immunity. Therefore, rather than "alleging violation of extremely abstract rights," plaintiffs must show that "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 640. In Brosseau v. Haugen, 543 U.S. ___ (2004), the Supreme Court considered how factually related existing precedent must be to an alleged

violation to render a rule of law "clearly established." The Court concluded that the standard established in Graham v. Connor, 490 U.S. 386, 396 (1989) ("the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application"), was "cast at a high level of generality" and therefore did not clearly establish a Fourth Amendment violation. Id. at ___.

The tests enunciated in Hill and Terry are far more specific than the general standard set forth in Graham. Furthermore, the Court's recent qualified immunity jurisprudence does not allow public officials such as Haberman, who are alleged to have committed blatant Fourth Amendment violations, to obtain immunity from suit. The Brosseau Court acknowledged that even with regard to highly general standards, "in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law." Id. Implicit in the Court's reasoning is the recognition that officials committing outrageous, yet sui generis, constitutional violations ought not to shield their behavior behind qualified immunity simply because another official has not previously had the audacity to commit a similar transgression.

We conclude that the Fourth Amendment violation as alleged in this case is both obvious and outrageous, and that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001). A social worker who lacks any legitimate justification

for seizing a child, but nonetheless seizes the child and demands, in direct contravention of a court order, that she enter the custody of her abusive father, would clearly know that his conduct is unconstitutional.[7]

### III

Jones' allegations, if true, establish that Haberman violated her clearly established Fourth Amendment right to be free from unreasonable seizures. We therefore **REVERSE** the district court's order granting Haberman's motion to dismiss on the basis of qualified immunity and **REMAND** for further proceedings.

---

[7] We emphasize that our disposition of this case is largely dictated by the Rule 12(b)(6) standard. Jones' complaint effectively portrays the encounter at issue as an unjustified seizure in light of clearly established law, and we must accept her allegations as true. As such, we conclude that the district court erred in granting qualified immunity at this stage in the litigation.