**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 23, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

SILVAN W., individually and as
natural parent and guardian ad litem of
A.W., a minor; ALANNA W.; CORY
W.; and MEGAN W.,

　　　　Plaintiffs-Appellants,

v.

DAN BRIGGS, individually and as an
agent of West Jordan City; ELAINE
TOTTEN, an agent of the State of
Utah, Division of Child and Family
Services (DCFS) in her individual and
not official capacity, a/k/a Elaine
Tottem; CHARLES KIRBY,
Detective, individually and as an agent
of West Jordan City; HOLLY
CURTIS, individually and as an agent
of West Jordan City; BRANDON
WILKERSON, individually and as an
agent of West Jordan City; DAN
GALLAGHER, LT., individually and
as an agent of West Jordan City;
WEST JORDAN CITY,

　　　　Defendants-Appellees.

No. 07-4272
(D.C. No. 2:04-CV-00360-DAK)
(D. Utah)

---

**ORDER AND JUDGMENT**[*]

---

[*]　　After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is
therefore ordered submitted without oral argument. This order and judgment is
not binding precedent, except under the doctrines of law of the case, res judicata,

(continued...)

Before **KELLY**, **PORFILIO**, and **O'BRIEN**, Circuit Judges.

Silvan W. and his wife, Alanna, together with their children, Cory, Megan, and A.W., appeal from the district court's summary judgment order, which ended their civil rights case against the defendants. We have jurisdiction under 28 U.S.C. § 1291. While we conclude that the district court erroneously applied the *Rooker-Feldman* doctrine,[1] we affirm for other reasons.

## BACKGROUND

On August 19 or 20, 2002, thirteen-year-old A.W. was sexually assaulted by the husband of her sister, Jaimie. The assault occurred while A.W. was at Jaimie's home. Alanna reported the assault to the Utah State Division of Child and Family Services (DCFS).

West Jordan City Police Officer Dan Briggs interviewed A.W. and Alanna on Wednesday, August 28. A.W. revealed that she was afraid, but "OK as long as [Jaimie's husband] [was] not around." Aplee. Supp. App. at 36. Alanna informed Briggs that "not only was A.W. the victim, but that the whole family was a victim," including Jaimie's husband. Aplt. App., Vol. 1 at 33. Alanna also stated

---

[*](...continued)
and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1]     *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

that "they [had] hooked [Jaimie's husband] up with a lawyer because" he could not afford one, Aplee. Supp. App. at 35, that she "was encouraging A.W. to forgive [him]" so the family could remain together, and that she and Silvan had allowed him inside their home several days after they learned of the assault, but they had "A.W. [leave] by a door where she would not see or come in contact with [him]," Aplt. App., Vol. 1 at 33.

On the afternoon of Friday, August 30, Briggs telephoned Alanna to set up another interview with her and A.W., and to interview Silvan for the first time. Alanna informed Briggs that she or Silvan "would get back to him after meeting with [their] attorney." Aplt. App., Vol. 1 at 34. Alanna also stated that she "did not like the way law enforcement seemed to be going after [Jaimie's husband] with such a vengeance," *id.*, and that she "did not want [A.W.] to testify" because it might traumatize her, *id.* at 33.

On Friday evening, Briggs sought legal advice from Assistant Attorney General Julie Lund, who worked in the Child Protection Division. According to Briggs, after he briefed Lund about the case, Lund agreed with him that A.W. should be removed from her parents home for her protection. Aplt. App., Vol. 1 at 162.

Briggs, other law enforcement personnel, and DCFS social worker Elaine Totten went to the home, where they learned from neighbors that the family (without Jaimie and her husband) had gone out to dinner. Cory and Megan (who

are adults), returned to the home around 10:00 p.m., and told Briggs that their parents had left town with A.W. for some unknown location, and that they did not know how to contact them. Cory, a peace officer, added that he last saw his parents and A.W. earlier in the day, when they had left town. The officers knew, however, that Cory and Megan were lying, as one of the neighbors had stated that she had only recently spoken with Cory, Megan, and Silvan by telephone about the police presence at their house. That neighbor had also informed the officers that while speaking on the phone with Silvan, she overheard Alanna remark that the officers were at the home "looking for A.W." *Id.*, Vol. 3 at 469. Cory and Megan were arrested for obstruction of justice and handcuffed.

Officers searched Megan and found her cell phone. In the phone's directory was a listing for "Dad's Cell Phone," Aplt. App., Vol. 3 at 470, which Briggs used to call Silvan. Briggs notified both Silvan and Alanna that Megan and Cory had been arrested for obstruction. According to Alanna, Briggs said that he had "obtained an order to pick A.W. up" and that if they "did not return immediately, [they] would be arrested for felony fleeing." *Id.*, Vol. 1 at 36. Silvan and Alanna returned home and released A.W. to DCFS custody. A.W. was then placed in her aunt and uncle's home. Cory and Megan were released after being detained in handcuffs for over an hour in front of their home.

On Tuesday, September 3, Lund filed a petition to commence proceedings in the juvenile court. *See* Utah Code Ann. § 78-3a-305(3) (Supp. 2002). The

following day, the juvenile court conducted a shelter hearing, during which Lund filed a verified petition, and the family's attorney, Phillip Dyer, filed an answer. *See id.* § 78-3a-306 (Supp. 2002). Based on the testimony and argument at the hearing, the juvenile court found that A.W.'s removal was justified. But it authorized DCFS to return A.W. to her parents' home if the parents agreed to a safety plan for A.W. that prohibited all contact between A.W. and Jaimie's husband, and that limited discussions of the sexual assault to therapy sessions. The juvenile court concluded the hearing by setting a "pretrial [date] on the underlying petition." Aplt. App., Vol. 1 at 125. A.W.'s parents signed a safety plan on September 5, and A.W. went home.

In 2004, Silvan, Alanna, Cory, Megan, and A.W. filed a 42 U.S.C. § 1983 suit in federal district court against West Jordan City, Briggs, the police officers who assisted Briggs, and Totten. The complaint advanced fifteen claims for relief. Claims one through ten asserted that each family member had been denied substantive due process and unlawfully seized. Claims eleven, twelve, fourteen, and fifteen alleged that Cory and Megan were subjected to excessive force and illegal searches. Claim thirteen alleged a violation of Silvan and Alanna's procedural due process rights. The district court granted the defendants summary judgment. It ruled that the *Rooker-Feldman* doctrine barred all claims related to A.W.'s seizure and removal because those claims essentially sought appellate review of the juvenile court's determination. Aplt. App., Vol. 1 at 18-19. The

district court further ruled that even if *Rooker-Feldman* did not apply, the defendants were entitled to qualified immunity.

## I. Standards of Review

"We review the district court's grant of summary judgment de novo using the same standard the district court used." *Williams v. Berney*, 519 F.3d 1216, 1219 (10th Cir. 2008). Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## II. *Rooker-Feldman*

"We review an application of the *Rooker-Feldman* doctrine de novo." *Carmona v. Carmona*, 544 F.3d 988, 995 (9th Cir. 2008); *see also Schutz v. Thorne*, 415 F.3d 1128, 1132 (10th Cir. 2005) (noting that questions of subject-matter jurisdiction are reviewed de novo). "The *Rooker-Feldman* doctrine prevents the lower federal courts from exercising jurisdiction over cases brought by state-court losers challenging state-court judgments rendered before the district court proceedings commenced." *Lance v. Dennis*, 546 U.S. 459, 460 (2006) (quotations omitted) (per curiam).

The doctrine has, however, "sometimes been construed to extend far beyond the contours of the *Rooker* and *Feldman* cases." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283 (2005). For example, "*Rooker-Feldman* does not otherwise override or supplant preclusion doctrine."

*Id.* at 284.  Thus, "[i]f a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion."  *Id.* at 293 (quotations and brackets omitted).

Here, the plaintiffs do not claim any injury from the juvenile court's ruling; nor do they seek to undo any aspect of that ruling.  Indeed, the juvenile court ordered A.W. returned to her parents if they agreed (and they did) to a safety plan.  Rather, the focus of this lawsuit is on the defendants' actions taken *before* any judicial involvement.  In a case essentially identical to the one before us, the Seventh Circuit held that "[b]ecause the injury that the plaintiffs here complain of was caused not by the state court's temporary custody order, but by the [prior] taking of [the minor child] by the DCFS agents and local [police] officers, this suit implicates the preclusion doctrine, not *Rooker-Feldman*."  *Jensen v. Foley*, 295 F.3d 745, 748 (7th Cir. 2002).  We agree that issue preclusion is potentially applicable here.[2]

---

[2]      The cases cited by the district court to support invocation of the *Rooker-Feldman* doctrine are not persuasive.  Specifically, *Bergman v. LaCouture*, 218 F. App'x 749 (10th Cir. 2007), involved a direct challenge to a state-court ruling.  And *English v. Meacham*, 24 F. App'x 897 (10th Cir. 2001), employed an expansive application of the *Rooker-Feldman* doctrine that would not pass muster after the Supreme Court's decision in *Exxon Mobil Corp.*, 544 U.S. at 283, 293.

But under Utah law, issue preclusion applies only if the earlier suit "resulted in a final judgment on the merits." *Oman v. Davis Sch. Dist.*, 194 P.3d 956, 965 (Utah 2008) (quotation omitted). As a result of the shelter hearing, the juvenile court simply made "an interim determination pending additional proceedings." *Office of the Guardian ad Litem ex rel. S.M.*, 154 P.3d 835, 842 (Utah 2007). While the juvenile court scheduled further proceedings after the shelter hearing, nothing in the record indicates the outcome of those proceedings. Further, the defendants only briefly mentioned collateral estoppel below, and they do not argue on appeal that collateral estoppel applies. Consequently, we turn to the district court's alternative basis for entering summary judgment. *See Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1233 n.4 (10th Cir. 2006) (declining to address collateral estoppel issue not argued on appeal).

### III. Qualified Immunity

When a defendant seeks summary judgment on the basis of qualified immunity, the plaintiff must establish that the defendant violated a constitutional right. *Williams*, 519 F.3d at 1219. In determining whether a constitutional violation occurred, we view "the facts in the light most favorable to the plaintiff." *Kelley v. City of Albuquerque*, 542 F.3d 802, 821 (10th Cir. 2008). The plaintiff must also show that the constitutional right was clearly established.[3] *Vondrak v.*

---

[3] While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then

(continued...)

*City of Las Cruces*, 535 F.3d 1198, 1204 (10th Cir. 2008), *petition for cert. filed*, 77 U.S.L.W. 3297 (U.S. Nov. 3, 2008) (No. 08-610).

## A.  Procedural Due-Process[4]

The Fourteenth Amendment's Due Process Clause gives parents "a protected liberty interest in the care, custody, and control of their children." *Arredondo v. Locklear*, 462 F.3d 1292, 1297 (10th Cir. 2006) (quotation omitted). Accordingly, state officials may not remove a child from his or her home without a predeprivation notice and hearing, unless there are emergency circumstances that pose an immediate threat to the child's safety and there is a prompt postdeprivation hearing. *Id.* at 1298. As Silvan and Alanna do not argue that they were denied a prompt postdeprivation hearing, we focus on whether emergency circumstances existed to remove A.W.

To meet this standard, "state officials must have evidence giving rise to a reasonable and articulable suspicion that the child has been abused or is in

---

[3](...continued)
determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory. *Pearson v. Callahan*, 2009 WL 128768, at *9 (Jan. 21, 2009) (overruling *Saucier v. Katz*, 533 U.S. 194 (2001)).

[4]      Because A.W.'s removal is a seizure that implicates her Fourth Amendment rights, *see J.B. v. Washington County*, 127 F.3d 919, 928 (10th Cir. 1997), she does not have an independent due-process claim, *see Becker v. Kroll*, 494 F.3d 904, 919 (10th Cir. 2007) ("The more general due process considerations of the Fourteenth Amendment are not a fallback to protect interests more specifically addressed by the Fourth Amendment in this context."). Similarly, the false-arrest and excessive-force claims of Cory and Megan, and the unlawful seizure claims of Silvan and Alanna, will be analyzed under the Fourth Amendment.

imminent peril of abuse." *Id.* Here, the victim herself reported the sexual assault. Further, A.W.'s parents had allowed the perpetrator back inside the home after they had learned of the assault. And by the time of A.W.'s removal, it had become increasingly clear that Alanna was not appreciating the seriousness of the assault, given her statements that the perpetrator was somehow a victim, that she was encouraging A.W. to forgive him for the sake of family unity, that she did not like law enforcement going after him, that she and Silvan had gotten an attorney for him, and that she did not want A.W. to testify. We conclude that there was ample evidence to raise a reasonable and articulable suspicion that A.W. had been abused and was in imminent peril of further abuse. Accordingly, there was no violation of Silvan and Alanna's procedural due process rights.

## B. Substantive Due-Process

The substantive component of the Fourteenth Amendment "protects an individual's fundamental liberty interests" and guards "against the exercise of governmental power that shocks the conscience." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008). The plaintiffs first argue that their fundamental rights of familial association with A.W. were violated by her removal.

The right of familial association arises from the concept of ordered liberty. *Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993). It is violated when government officers intend to interfere with a protected relationship, and the

reason for interfering "constitute[s] an undue burden on [the plaintiffs']

associational rights." *Id.*; *see also Lowery v. County of Riley*, 522 F.3d 1086,

1092 (10th Cir.), *cert. denied*, 129 S. Ct. 510 (2008). Assuming that the requisite

intent to interfere is satisfied by A.W.'s removal, there is no evidence that the

plaintiffs' familial association rights were unduly burdened. We note that "[t]he

prevention of sexual exploitation and abuse of children constitutes a government

objective of surpassing importance." *Griffin*, 983 F.2d at 1548 (quotation

omitted). As noted above in Part III.A., A.W. was removed on the basis of a

reasonable suspicion of past and impending harm. Under these circumstances,

plaintiffs' associational rights do not outweigh the government's "interest in

protecting [A.W.] from abuse and from situations where abuse might occur." *Id.*

Plaintiffs also contend that A.W.'s removal shocks the conscience. To the

extent this contention can stand on its own, apart from the asserted violation of

familial-association rights, we conclude it lacks merit. Specifically,

> to satisfy the 'shock the conscience' standard, a plaintiff must do
> more than show that the government actor intentionally or recklessly
> caused injury to the plaintiff by abusing or misusing government
> power. That is, the plaintiff must demonstrate a degree of
> outrageousness and a magnitude of potential or actual harm that is
> truly conscience shocking.

*Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995). As already indicated, there

is nothing outrageous in A.W. being removed under the perception that she was in

danger of further sexual assault. Moreover, the magnitude of harm caused by that

-11-

removal was lessened by A.W.'s placement with her aunt and uncle, and by the relatively short duration of that placement. *See Nicholson v. Scoppetta*, 344 F.3d 154, 172 (2d Cir. 2003) (stating that "brief removals generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal").

There was no violation of the plaintiffs' substantive due-process rights.

## C. Fourth Amendment

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend IV. The plaintiffs claim a variety of Fourth Amendment violations.

We first address the seizure of A.W. Exigent circumstances may justify a warrantless seizure and detention for child protective purposes. *See Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1244, 1249-50 (10th Cir. 2003). An "*immediate* risk to [the child's] safety would give rise to 'exigent circumstances.'" *Id.* at 1250 n.24. For reasons already expressed, we conclude that exigent circumstances supported A.W.'s removal without a warrant.

As for the warrantless arrests of Cory and Megan, they will survive constitutional scrutiny only "if a reasonable officer could have believed that probable cause existed to make the arrest[s]." *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) (quotations omitted). "Probable cause

exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008) (quotation omitted).

Cory and Megan were arrested for violating Utah's obstruction-of-justice statute. That statute, among other things, criminalizes giving false information during a criminal investigation, with the intent to hinder, delay, or prevent that investigation. Utah Code Ann. § 76-8-306(1)(i). Cory and Megan told Briggs that they did not know where A.W. and their parents were or how to contact them. A reasonable officer could have concluded that Cory and Megan were lying with the intent to hinder A.W.'s removal, given Briggs' awareness that Cory and Megan had just returned from a family dinner, where the family had learned that the police were looking for A.W. Consequently, probable cause existed to arrest Cory and Megan for obstruction of justice. Thus, their warrantless arrests were not unconstitutional.

Cory and Megan's claims of excessive force are based on their handcuffing following arrest. Megan states in her affidavit that she was handcuffed and detained "in full view of neighbors, friends and others" for over an hour. Aplt. App., Vol. 1 at 41. Cory provides more elaboration, stating that during the hour or more in which he was handcuffed, he became dehydrated and was refused

-13-

anything to drink. He further asserts that he suffered "chaffing and soreness of wrists" and "extreme emotional trauma" as a result of being publicly displayed in handcuffs. *Id.* at 46.

Whether the handcuffing of Cory and Megan was constitutional depends on the objective reasonableness of the officers' actions. *See York,* 523 F.3d at 1210. Reasonableness is governed by the totality of the circumstances, including "the severity of the crime at issue, whether [Cory and Megan] pose[d] an immediate threat to the safety of the officers or others, and whether [Cory and Megan] [were] actively resisting arrest or attempting to evade arrest by flight." *Weigel v. Broad*, 544 F.3d 1143, 1151-52 (10th Cir. 2008) (quotations omitted). While Cory and Megan were not arrested for an especially severe crime and were not actively resisting arrest or attempting to flee, the officers could have been reasonably concerned for their safety, given their awareness that Cory was a peace officer and might have been armed. Further, Cory and Megan were released upon A.W.'s arrival at the home, and therefore, were not detained any longer than necessary to resolve the situation which necessitated police involvement. And because there is no evidence that Cory suffered more than a de minimis injury or that he notified the officers that his handcuffs were painful, he cannot maintain an excessive force claim based on unduly tight handcuffing. *See Vondrak*, 535 F.3d at 1208-09 (10th Cir. 2008), *petition for cert. filed*, 77 U.S.L.W. 3297 (U.S. Nov. 3, 2008) (No. 08-610). Similarly, there is no

evidence that Cory suffered any injury from being denied liquids. *See Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007). Finally, while we do not doubt that being detained in handcuffs in public view would be traumatic, not every indignity—"even if it may later seem unnecessary in the peace of a judge's chambers"—rises to the level of a constitutional violation. *Mecham v. Frazier*, 500 F.3d 1200, 1205 (10th Cir. 2007).

Cory and Megan's last Fourth-Amendment claim is that they were unlawfully searched. Megan's claim involves both her person and her cell phone. "Under the search incident to arrest exception [to the Fourth Amendment's warrant requirement], a police officer, incident to an arrest, may search a person." *Lavicky v. Burnett*, 758 F.2d 468, 474 (10th Cir. 1985). Because Cory and Megan's warrantless arrests were constitutionally permissible, so too were the contemporaneous searches of their persons for weapons and evidence. *See id.* Further, the permissible scope of a search incident to arrest includes the contents of a cell phone found on the arrestee's person. *United States v. Finley*, 477 F.3d 250, 260 (5th Cir.), *cert. denied*, 127 S. Ct. 2065 (2007); *see also United States v. Ortiz*, 84 F.3d 977, 983-84 (7th Cir. 1996) (upholding officer's scan of messages in digital pager as valid search incident to arrest); *see generally United States v. Donnes*, 947 F.2d 1430, 1437 (10th Cir. 1991) (recognizing that "a search incident to a lawful arrest permits a law enforcement officer to conduct a

warrantless search of a container located in the area of the arrestee's immediate control").

Next, we turn to Silvan and Alanna's claim that they were unlawfully seized when Officer Briggs told Alanna over the phone that if she and Silvan did not return home with A.W. they would be arrested. "A seizure occurs for Fourth Amendment purposes when a reasonable person would have believed that he was not free to leave." *Jones v. Hunt*, 410 F.3d 1221, 1225-26 (10th Cir. 2005) (quotations omitted). We typically employ a variety of factors in determining whether a constitutionally recognized seizure occurred, most of which assume physical proximity between the officer(s) and suspect(s). *See id.* at 1226 (listing eight factors: the threatening presence of several officers; the brandishing of weapons; physical touching; "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory"; "prolonged retention of a person's personal effects"; "a request to accompany the officer to the station"; interaction in a nonpublic or confined place; and absence of members of the public). Three of these factors could, however, be applied to the instant telephonic contact with police. First, in regard to an officer's "use of aggressive language or tone of voice," Officer Briggs' threat to arrest Silvan and Alanna "for felony fleeing" if they did not return home could lead a reasonable person to believe that compliance is compulsory. Second, while Silvan and Alanna were not "request[ed] to accompany [an] officer to a police station," Officer Briggs

-16-

was attempting to curtail their freedom of movement by telling them to return home. And third, while the officers were not in possession of any family property, they had arrested two of Silvan and Alanna's children.

"Fourth Amendment jurisprudence suggests a person is seized not only when a reasonable person would not feel free to leave an encounter with police, but also when a reasonable person would not feel free to *remain* somewhere, by virtue of some official action." *Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005). In *Bennett*, the Sixth Circuit held that an officer's command to a bicyclist that he walk his bike out of a Detroit suburb and back to Detroit, while being escorted at least part of the way by the officer, was a seizure implicating the Fourth Amendment. *Id.*

Nevertheless, we conclude that the lack of coercion typically inherent in a physical encounter with police dooms the instant Fourth Amendment seizure claims. In doing so, we find support in the Seventh Circuit's decision in *Rodgers v. Lincoln Towing Service, Inc.*, 771 F.2d 194 (7th Cir. 1985). There, a detective telephoned a vandalism suspect and threatened him with arrest if he did not go to the police station "to answer charges." *Id.* at 199 (quotation omitted). The court held that the threat of arrest did not elevate the telephone call into a Fourth Amendment seizure:

> That [the detective] told [the suspect] he would secure an arrest warrant if [the suspect] refused [to go to the police station] does not alter the outcome; [the suspect] was free to demand that [the

-17-

detective] do just that. [The detective] was not even confronting [the suspect] physically; [the suspect] could have hung up the phone. That [the detective] may have been verbally abusive does not elevate the phone call, with the distancing inherent in the tenuousness of a telephone connection and the ease with which [the suspect] could have hung up the phone, into a seizure for purposes of the Fourth Amendment.

*Id.* at 200; *cf. Butitta v. Carbajal*, No. 96-16553, 1997 WL 345719, at *1 (9th Cir. June 23, 1997) (unpublished) (holding that police officers did not violate the Fourth Amendment by telephoning an individual and threatening "to seize a motorcycle in her possession and to arrest her without a warrant"). Because Silvan and Alanna could have terminated the call from Briggs or simply refused his demand to return home,[5] we conclude that Briggs' call was not a Fourth Amendment seizure.

## IV.  Claims Against West Jordan City

"[W]ithout the predicate constitutional harm inflicted by an officer, no municipal liability exists." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1264 (10th Cir. 2008). Because no constitutional violation occurred here, the district court properly granted summary judgment on any claims against West Jordan City.

---

[5]    Indeed, there is some indication in the record that Silvan and Alanna contacted their attorney and relied on his advice in deciding whether to comply with Briggs' demand. *See* Aplt. App., Vol. 1 at 36-37, ¶¶ 43-45 (Alanna W.'s affidavit).

## CONCLUSION

Although the district court erroneously applied the *Rooker-Feldman* doctrine to this case, summary judgment was properly granted in favor of the defendant public officers on the alternative basis of qualified immunity. Any claims against the municipality of West Jordan City fail in the absence of a constitutional violation by one of its officers.

Accordingly, the judgment of the district court is AFFIRMED.

Entered for the Court


John C. Porfilio
Circuit Judge