**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 7, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ADAM LOWTHER, on behalf of himself
and as next friend of minor children, W.L.
and A.L; JESSICA LOWTHER, on behalf
of herself and as next friend of minor
children, W.L. and A.L; KELLY STOUT
SANCHEZ, guardian ad litem for A.L. and
W.L.,

     Plaintiffs - Appellants,

v.

CHILDREN YOUTH AND FAMILY
DEPARTMENT; BERNALILLO
COUNTY SHERIFF'S DEPARTMENT;
MARIA MORALES; JACOB
WOOTTON; CATHERINE SMALLS;
BRIAN THORNTON; MARTIN
LOZANO; ANDREA MILES; BOARD
OF COUNTY COMMISSIONERS FOR
BERNALILLO COUNTY,

    Defendants - Appellees.

No. 23-2056

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:18-CV-00868-MIS-JFR)**
_____

Vincent Ward, The Ward Law Firm, Albuquerque, New Mexico, for Plaintiffs –
Appellants.

Brian Griesmeyer, SaucedoChavez, P.C. (Frank T. Apodaca with him on the brief) and
H. Nicole Werkmeister, Stiff, Garcia & Associates, LLC (John S. Stiff and Kathy L.
Black on the brief), Albuquerque, New Mexico, for Defendants – Appellees.

_____

Before **McHUGH**, **MURPHY**, and **CARSON**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

New Mexico's Children, Youth, and Family Department ("CYFD") received an anonymous report that Dr. Adam Lowther was sexually abusing his four-year-old daughter, A.L. The report was based on a disclosure A.L. made to her schoolteacher and A.L.'s inappropriate behavior in class. Within a few hours, a social worker and several law enforcement officers entered the Lowther home without a warrant and took A.L. and her older brother into custody. Dr. Lowther was arrested, and the children were eventually returned to their mother, Jessica Lowther. But the children were removed a second time after it became apparent Dr. Lowther would be released from jail.

Ultimately, the charges against Dr. Lowther were dismissed and the children returned to their parents. Dr. and Mrs. Lowther then sued various state officials on behalf of themselves and their children, asserting constitutional claims under 42 U.S.C. § 1983 and state law claims under the New Mexico Tort Claims Act. The district court granted summary judgment in Defendants' favor, concluding they are entitled to qualified immunity on the § 1983 claims and that the state law claims fail for similar reasons. The Lowthers appealed, but they have not shown any error in the district court's rulings. We thus affirm.

2

## I.    BACKGROUND

### A.    *Factual History*

**1.    The Initial Report**

At the time of the removals, Dr. and Mrs. Lowther had two children, seven-year-old W.L. and four-year-old A.L. A.L. was enrolled in school and taught by Betty DuBoise. On August 25, 2017, Ms. DuBoise called Dr. Lowther and told him A.L. had been "touching [A.L.'s] private area and hiking up her dress" in class. App. Vol. II at 492. Dr. Lowther said that he and Mrs. Lowther had "been working with" A.L. on this behavior and that "she gets it from watching" her brother "touch himself while sucking his thumb." *Id.* A few days later, Ms. DuBoise spoke with Mrs. Lowther about A.L.'s behavior. Mrs. Lowther stated that A.L. had "been having a hard time and that she would talk with her." *Id.*

On August 30, 2017, at approximately 2:28 p.m., Ms. DuBoise anonymously called CYFD. She reported her suspicion that Dr. Lowther was sexually abusing A.L.[1] CYFD's intake report described Ms. DuBoise's account as follows, with Ms. DuBoise identified as "Source":

> [A.L] told a male student that he had a penis. Source redirected the children. Source asked [A.L.] how she knew the word. [A.L.] says [Dr. Lowther] puts her on his lap when he goes to the bathroom and likes to move her up and down like a horsey. [Dr. Lowther] sleeps with her and kisses her on the lips with tongue. [Dr. Lowther] touches her on her

---

[1] The Lowthers state that "the alleged disclosure occurred after [they] criticized [Ms.] DuBoise's teaching skills and asked to disenroll A.L. from the school." Appellants' Br. at 7. Because Defendants were not privy to this information, it is irrelevant to our analysis.

3

bottom and puts his finger inside of her. [A.L.] was able to demonstrate the movement with her hands and fingers. [A.L.] relayed that her brother kisses her with tongue and that her brother touches her as well. [A.L.] said [Dr. Lowther] also touches her brother but did not give any detail. [A.L.] stated that this happens all the time. Source asked [A.L.] if she had told [Mrs. Lowther]. [A.L.] said [Dr. Lowther] told her not to and that it was their secret. [Dr. Lowther] told [A.L.] that [Mrs. Lowther] would get mad. Source tried to encourage [A.L.] to speak with [Mrs. Lowther] and [A.L.] said [Mrs. Lowther] would yell. [A.L.] has been demonstrating some behaviors in class since the start of school. She is not listening, talking back, she spit at another girl and has been aggressive toward other children.

*Id.* at 492–93 ("[A.L.]" alterations in original). The CYFD intake report also described Ms. DuBoise's conversations with Dr. and Mrs. Lowther concerning A.L. touching herself in class.

Less than two hours later, at approximately 3:45 p.m., CYFD Investigator Maria Morales contacted Ms. DuBoise and confirmed the contents of the intake report. Investigator Morales also contacted the Bernalillo County Sheriff's Department ("BCSO") and "request[ed] assistance in conducting a welfare check of the Lowther children." *Id.* at 492. At approximately 3:50 p.m., BCSO dispatched Deputies Catherine Small, Brian Thornton, and Martin Lozano (collectively, "the Deputies") to the Lowther home, with Deputy Small as the lead field deputy.[2]

2.      **First Contact with the Lowthers**

At 4:05 p.m., the Deputies arrived at the Lowther home and met with Investigator Morales, who gave them "more detail regarding the nature of the

---

[2] Deputy Catherine Small appears to have been incorrectly named as Catherine Smalls in this matter.

allegations." *Id.* at 493. At approximately 4:19 p.m., the Deputies knocked on the Lowthers' front door and began speaking with Mrs. Lowther. Mrs. Lowther was on the phone with Dr. Lowther when she answered the door, and she contemporaneously relayed her conversation with the Deputies to Dr. Lowther.

The Deputies told Mrs. Lowther they needed to conduct a welfare check of her children. They said a welfare check was necessary "because 'somebody called and wanted to remain anonymous that they were worried [about the children].'" *Id.* at 494 (alteration in original). Mrs. Lowther refused entry, stating she would not let the Deputies "in the house until her husband arrived." *Id.* Deputy Thornton responded, "So in [the] State of New Mexico, and we're conducting a check on children, if you deny us access you can be arrested." *Id.*

Mrs. Lowther relayed Deputy Thornton's response to Dr. Lowther. She also stated, "I don't understand what's going on – what? Well, that's what they're telling me, I don't know what to do here. I don't understand what's going on." App. Vol. VI at 1322. Mrs. Lowther told the Deputies that Dr. Lowther was on his way home and that they needed to stay outside until he arrived. Deputy Thornton replied, "Sure," but told Mrs. Lowther she could not close the front door. *Id.* at 1323. Mrs. Lowther told Dr. Lowther that she was "not allowed to close the door." *Id.* Mrs. Lowther also instructed A.L. and W.L. to go to their rooms.

Deputy Thornton offered to explain "what's going on" if Mrs. Lowther ended her call with Dr. Lowther. *Id.* Mrs. Lowther said she did not want to end the call, and Deputy Thornton replied, "That's fine." *Id.* However, Deputy Thornton did explain

5

that the visit was prompted by a phone call CYFD received "from school." *Id.* at 1324.

### 3.    Dr. Lowther's Arrival

At approximately 4:41 p.m., Detective Jacob Wootton was dispatched to the Lowther home to lead the investigation. On his way, he instructed the Deputies to detain Dr. Lowther when Dr. Lowther arrived.

Dr. Lowther arrived home at 4:42 p.m. Deputy Thornton met him outside and explained that the Deputies were responding to an anonymous call concerning the welfare of the Lowther children. The Deputies did not permit Dr. Lowther to enter his home.

Investigator Morales also spoke with Dr. Lowther when he arrived. She briefly explained that there were allegations of child abuse, but she did not identify the suspected perpetrator. Investigator Morales provided Dr. Lowther with a parent's guide that detailed the process if the children were taken into CYFD custody and Dr. Lowther's right to file a complaint against her. Investigator Morales told Dr. Lowther that she would provide more detail when Detective Wootton arrived.

After Dr. Lowther and Investigator Morales spoke, Dr. Lowther informed Deputy Thornton "that he was 'not going to let anybody into the house.'" App. Vol. II at 495. In response, Deputy Thornton detained Dr. Lowther by placing him in the back of a patrol car. At this point, Deputy Thornton clarified for Dr. Lowther that the complaint was specifically against him. Deputy Thornton also stated that Detective Wootton would explain more when he arrived and that N.M. Stat. § 30-6-4

6

permitted the Deputies to enter a home "to check on the welfare of children." App. Vol. VI at 1335. Deputy Thornton also took Dr. Lowther's phones because they might have contained evidence.

While Dr. Lowther was in the patrol car, Deputies Thornton and Lozano asked him if there were firearms in the home and where they were located. Dr. Lowther confirmed he had firearms in the home and said Mrs. Lowther would know their location. Deputy Thornton thanked Dr. Lowther for his cooperation.

Shortly after this conversation, Deputy Small asked Dr. Lowther to exit the patrol car. She handcuffed him and had him return to the patrol car.

### 4.    The Warrantless Entry

While Dr. Lowther was outside, the Deputies continued to speak with Mrs. Lowther at the front door. They provided more detail about the CYFD report, including that A.L. made "very descriptive" statements to someone at her school. App. Vol. II at 495. They also told Mrs. Lowther that a detective was on his way. Mrs. Lowther "expressed incredulity" that the visit was prompted by something a four-year-old said. *Id.* at 496.

The Deputies also explained that "Dr. Lowther was being detained but was not under arrest." *Id.* Mrs. Lowther asked what A.L. had said at school, and a deputy told her that he did not know. Mrs. Lowther replied, "At what point is the information going to flow?" App. Vol. VI at 1350. The Deputies said there would be more information after A.L. was interviewed by a child therapist.

The Deputies and Mrs. Lowther continued to talk, and Mrs. Lowther said A.L. "was not unsafe." App. Vol. II at 496. A deputy responded that if this were his investigation, Mrs. Lowther "would already be in the back of a police car because she was obstructing the officers' duty to check on the welfare of a child." *Id.* Mrs. Lowther then stated, "My duty is to my husband and my husband –" at which point the deputy cut her off and said, "I don't care right now. . . . I'm just letting you know that if this was my investigation, you would be in handcuffs in the back of a car. So you might want to consider your actions." App. Vol. VI at 1351.

Deputy Small then addressed Mrs. Lowther. She explained that medical personnel were coming to examine the children, and Mrs. Lowther "could either allow them access or be detained." App. Vol. II at 496. In response, Mrs. Lowther asked if the child therapist who would interview A.L. had arrived. Deputy Thornton explained that a therapist was not coming because A.L. would be transported to a safehouse for the interview. Mrs. Lowther asked if this meant the Deputies were going to take A.L., and a deputy responded that "no decisions had been made" but A.L. would eventually be interviewed at a safehouse. *Id.*

At this point, Deputy Small again stated that medical personnel were coming and asked Mrs. Lowther if she was going to let them inside or be detained. The Deputies entered the Lowther home at approximately 4:44 p.m., about twenty-five minutes after they first arrived. Medical personnel arrived and did a medical check on the children at about 5:13 p.m. While the Deputies were inside, Mrs. Lowther "lied to the officers regarding her knowledge of whether there were any weapons or firearms

8

in the house." App. Vol. III at 774. She later "acknowledged the location of the firearms and agreed not to go near them." *Id.*

**5.       Detective Wootton's Arrival**

Detective Wootton arrived approximately six minutes after the Deputies entered the Lowther home. Detective Wootton understood the situation because he had reviewed the CYFD report, and the Deputies had informed him that Dr. and Mrs. Lowther were not cooperating. Additionally, when Detective Wootton arrived, he discussed the case with Investigator Morales.

When Detective Wootton went inside the home, he read Mrs. Lowther her *Miranda* rights, and she agreed to answer his questions. Detective Wootton began the interview by asking Mrs. Lowther why she had not let the Deputies inside. She replied, "I just, I just don't like letting people into my house who I don't know. I was with my children by myself." App. Vol. VI at 1410. Detective Wootton asked if Dr. Lowther said to let the Deputies in. Mrs. Lowther responded, "He said not to let you in." *Id.*

After this exchange, Investigator Morales discussed the abuse allegations with Mrs. Lowther. Investigator Morales explained, "So, the allegations right now that we're looking at is sexual molestation and sexual abuse and lack of supervision. So, those are the allegations against both you and dad." *Id.* at 1413. Mrs. Lowther replied that these allegations came "completely out of left field." *Id.* Detective Wootton then informed Mrs. Lowther that he would be "taking the children on a 48-hour hold." *Id.* at 1415.

Next, Detective Wootton went outside to speak with Dr. Lowther. Detective Wootton told Dr. Lowther the specific nature of the allegations and reiterated that Dr. Lowther was not under arrest. Dr. Lowther asked why he was still in handcuffs, and Detective Wootton replied, "I have no idea." App. Vol. II at 498. Detective Wootton then directed Deputy Thornton to remove the handcuffs. After the handcuffs were removed, Dr. Lowther was placed back in the patrol car.

**6.       The First Removal & Safehouse Interviews**

A.L. and W.L. were removed from their home, transported to a safehouse, and forensically interviewed that night ("First Removal"). A.L. was interviewed twice for a total of fifty-four minutes. W.L. was interviewed once for forty minutes.

The district court provided the following synopsis of the interviews, which the parties have not challenged:

> A.L. stated, among other things, that she got into trouble for touching her privates at school; she sits on her father's lap while he is defecating; her father touches her "pee-pee" and "gina" in the bathroom, which she repeatedly stated was their "secret"; her father kisses her "butt-cheeks"; and takes photographs and videos of her "butt and gina," with his phone, sometimes while she is saying "fuck."

> W.L. stated that he and his sister are spanked on the bottom with a wooden spoon; sometimes, mostly by his father, they are slapped on the face; he feels nervous around his mother; he does not feel safe around his father; his father "is real mean and I don't like to be around him a lot . . . because he hurts me a lot;" and that his father sometimes pushes him "hard down on the ground" which causes him to hit the back of his head.

*Id.* at 499.

Detective Wootton reviewed the interviews that night and directed the Deputies to transport Dr. and Mrs. Lowther to the BCSO station. Detective Wootton

10

charged Dr. Lowther with criminal sexual penetration of a minor and criminal sexual contact of a minor. Mrs. Lowther was not charged and was allowed to leave the station. That night, after the interviews, BCSO obtained a warrant and searched the Lowthers' home.

### 7.    A.L.'s Physical Exam

The following day, August 31, Investigator Morales took A.L. for a physical exam at the Albuquerque Sexual Assault Nurse Examiners (SANE) Collaborative. A.L. had a follow-up exam the next day, September 1. The follow-up exam occurred at a different facility and was conducted by Dr. Shalon Nienow. Dr. Nienow's report noted that in the SANE exam, "an injury was noted at 12 o'clock on the anus" that was "consistent with tearing and/or bruising." App. Vol. III at 811. Dr. Nienow reexamined A.L. and reported, "Normal anal folds. Skin tag at 12 o'clock. Tearing visualized on SANE photographs has resolved with new skin present on right side of anal tag." Supp. App. at 620. In the "diagnostic impressions" section of the report, Dr. Nienow wrote, "Normal physical examination today. Previous examination with anal tear present. This finding is consistent with the child's disclosure of anal penetration and constitutes child sexual abuse." *Id.*

### 8.    The Safety Plan

Also on September 1, Investigator Morales and Mrs. Lowther spoke about the allegations against Dr. Lowther. Mrs. Lowther said "she was unaware of any misconduct by her husband" and "did not accept the allegation as true . . . because nothing in [her] 18 years of marriage to him would indicate that he could or would

commit any crime." App. Vol. III at 812. Mrs. Lowther wanted A.L. to be in therapy because she did not believe A.L. "would say such things unless something had happened to her." *Id.*

That same day, CYFD developed a safety plan to release the children from protective custody. Mrs. Lowther's parents, John and Terry Borg, would act as safety monitors. CYFD uses safety monitors "to allow children to be returned to their parents' custody, even when CYFD has lingering concerns about the parents' ability to protect their children." App. Vol. IV at 1054. Safety monitors must remain neutral and cannot express their belief or disbelief of abuse disclosures. In-home services clinician Andrea Miles explained this neutrality requirement to the Borgs before they became safety monitors.

On September 4, CYFD held a transfer meeting with Mrs. Lowther, the Borgs, Investigator Morales, Ms. Miles, and CYFD supervisors Yvonne Meade and Robin Yoder to discuss returning custody to Mrs. Lowther with the Borgs acting as safety monitors. The meeting participants agreed that Ms. Miles would work with the family. The children were then in Mrs. Lowther's custody under the safety monitor arrangement.[3]

---

[3] It is unclear when the children were returned to Mrs. Lowther. But they must have been returned on or before September 6, the date the children were removed a second time.

9.      **The Second Removal**

On September 5, a New Mexico state district court held a hearing concerning Dr. Lowther's release from jail. The assistant district attorney assigned to the case "expressed concerns regarding Dr. Lowther's potential access to the Lowther children via his influence over Mrs. Lowther and her parents, the Borgs." *Id.* at 1054–55. This concern stemmed from recorded calls between Dr. and Mrs. Lowther "in which they discussed leaving town with the children." *Id.* at 1055.

Mr. Borg and Ms. Miles were both at the criminal hearing. During or immediately after the hearing, Mr. Borg approached Ms. Miles and "angrily expressed his disbelief to [her] on the allegations against Dr. Lowther, putting his hand on her, calling her his 'helper,' and telling her she needed to fix the situation." *Id.* Because of this interaction, Ms. Miles was concerned that Mr. Borg was not a neutral safety monitor.

The following morning, the New Mexico district court issued an order releasing Dr. Lowther from custody. There were several conditions placed on the release, including that Dr. Lowther wear a GPS monitor and not contact Mrs. Lowther or their children. Within thirty minutes after the order was entered, CYFD personnel—including Investigator Morales and Ms. Miles—met to discuss the Borgs' ability to serve as safety monitors "given Dr. Lowther's imminent release from custody." *Id.* at 1056. The meeting participants had their "original concerns about the ability of Dr. and Mrs. Lowther to care for their children," but they were

13

also worried about the Borgs' ability to remain neutral and the "possibility that Dr. and Mrs. Lowther posed a risk of absconding with" the children. *Id.*

Based on these concerns, either Investigator Morales or Ms. Miles called Detective Wootton regarding a second 48-hour hold. "[Detective] Wootton considered CYFD's input and concerns, and he then decided to place the Lowther children on a second 48-hour hold, before Dr. Lowther was released from jail." *Id.* The children were removed a second time ("Second Removal"), although they were ultimately reunited with Dr. and Mrs. Lowther. The charges against Dr. Lowther were dismissed after the district attorney's office declined to prosecute.

### B.    *Procedural History*

On behalf of themselves and their children, Dr. and Mrs. Lowther filed suit against BCSO, Detective Wootton, the Deputies, CYFD, Investigator Morales, and Ms. Miles (collectively, "Defendants"). They alleged several violations of the United States Constitution and the New Mexico Tort Claims Act. The constitutional claims were brought pursuant to 42 U.S.C. § 1983.

After several rounds of briefing, the district court granted summary judgment in Defendants' favor on all federal claims. The Lowthers filed a timely appeal. Before considering the merits of the Lowthers' appellate arguments, we outline their claims on appeal and the district court's relevant rulings.

### 1.    Counts 1 & 10 – Warrantless Arrest

In Count 1, Dr. Lowther asserts that Detective Wootton and the Deputies (collectively, "the County Defendants") violated the Fourth Amendment by

14

unlawfully seizing and arresting Dr. Lowther on August 30, 2017.[4] The County

Defendants moved for summary judgment on Count 1, arguing they are entitled to

qualified immunity because any warrantless arrest of Dr. Lowther was justified by

probable cause. The district court agreed with the County Defendants, concluding

there was probable cause to arrest Dr. Lowther both before and after the children's

safehouse interviews. The court further concluded that even if there was a

constitutional violation, it was not clearly established.

In Count 10, the Lowthers assert a claim against BCSO under the New Mexico

Tort Claims Act for false arrest and imprisonment of Dr. Lowther on August 30,

2017. The district court dismissed this claim based on its ruling that any warrantless

arrest of Dr. Lowther was supported by probable cause.

## 2.    Count 4 – Warrantless Entry

In Count 4, the Lowthers assert that Investigator Morales and the County

Defendants violated the Fourth Amendment by entering the Lowther home on August

30, 2017, without a warrant.[5] The County Defendants argued they are entitled to

---

[4] Dr. Lowther also asserted Count I against BCSO. He has not appealed the dismissal of Count I against BCSO, so we do not address it further.

[5] The Lowthers also asserted Count 4 against CYFD but voluntarily dismissed that claim. That voluntary dismissal is not at issue on appeal.

qualified immunity because Mrs. Lowther consented to the entry and alternatively, because the warrantless entry was justified by exigent circumstances.

The Lowthers argued, among other things, that the County Defendants had not timely raised the exigent circumstances exception. The district court initially ruled that exigency had been waived, but later reconsidered and concluded exigency had been timely raised. The district court further concluded that the County Defendants were entitled to qualified immunity because exigent circumstances justified the warrantless entry. The exigent circumstances were the reasonable suspicion A.L. "had been abused or [was] in imminent peril of abuse." App. Vol. III at 681. The district court later dismissed Count 4 against Investigator Morales because she is also entitled to qualified immunity based on the exigent circumstances.

### 3.    Counts 5 & 12 – First Removal

In Count 5, the Lowthers assert that Investigator Morales and Detective Wootton violated the Fourth and Fourteenth Amendments[6] by removing the

---

[6] The Fourth Amendment claims in Counts 5 and 6 can be asserted only by the children because Fourth Amendment rights are personal and cannot be asserted vicariously. *See Hollingsworth v. Hill*, 110 F.3d 733, 738 (10th Cir. 1997). And because A.L. and W.L. have a claim under the Fourth Amendment, they do not have an independent due process claim under the Fourteenth Amendment. *See Silvan W. v. Briggs*, 309 F. App'x 216, 222 n.4 (10th Cir. 2009) (unpublished); *Becker v. Kroll*, 494 F.3d 904, 919 (10th Cir. 2007). So, the Fourteenth Amendment claims in Counts 5 and 6 can be asserted by Dr. and Mrs. Lowther only, not their children.

16

Lowther children "without a warrant or reasonable suspicion the children were in imminent danger."[7] App. Vol. II at 571. This claim stems from the First Removal.

Detective Wootton moved for summary judgment, arguing he is entitled to qualified immunity because exigent circumstances justified the First Removal. He contended there was an exigency because he had reasonable suspicion A.L. and W.L. had been abused and were in imminent danger of abuse. Alternatively, he argued the law was not clearly established.

The district court granted summary judgment in Detective Wootton's favor, concluding the First Removal was justified by exigent circumstances and that even if there was a constitutional violation, the law was not clearly established. The Lowthers asked the court to reconsider this ruling. Among other things, they argued the court incorrectly applied the Fourteenth Amendment exigency standard to their Fourth Amendment claim. In response, Detective Wootton argued that the Fourth and Fourteenth Amendment exigency standards are the same, so the court's application was correct. The district court declined to reconsider, concluding "that the standard governing Fourth Amendment violations in the context of the warrantless removal of a child closely tracks that of the Fourteenth Amendment such that qualified immunity should be granted." App. Vol. III at 778.

---

[7] Count 5 was also asserted against CYFD. The Lowthers have not appealed the dismissal of Count 5 against CYFD, so we do not address it further.

The district court later dismissed Count 5 against Investigator Morales as well, reiterating its prior ruling that the First Removal was justified by exigent circumstances and that any constitutional violation was not clearly established.

In Count 12, the Lowthers assert BCSO violated the New Mexico Tort Claims Act by falsely arresting and imprisoning the Lowther children during the First Removal.[8] The district court dismissed this claim for the same reasons it dismissed Count 6—exigent circumstances justified the removal.

### 4.    Count 6 – Second Removal

In Count 6, the Lowthers assert that Investigator Morales and Ms. Miles violated the Fourth and Fourteenth Amendments by removing the Lowther children "without a warrant or reasonable suspicion the children were in imminent danger."[9] App. Vol. II at 572. This claim is based on the Second Removal.

Investigator Morales and Ms. Miles moved for summary judgment on Count 6, asserting qualified immunity. They first argued they could not be held liable for the Second Removal because law enforcement officers were responsible for the removal. Alternatively, they argued there was no constitutional violation because of exigent circumstances, namely their reasonable suspicion the children had been abused and

---

[8] In their Brief, the Lowthers incorrectly state this claim was asserted against CYFD.

[9] This claim was also asserted against CYFD, but the Lowthers voluntarily dismissed the claim against CYFD. That voluntarily dismissal is not at issue on appeal.

were in imminent danger of abuse. They further contended that if there was a violation, it was not clearly established.

The district court ruled that Investigator Morales and Ms. Miles are entitled to qualified immunity because the Lowthers had not shown the alleged violation was clearly established. The district court therefore declined to address the other arguments for dismissal.

**5.    Final Judgment**

After the various summary judgment rulings, only a state law claim against BCSO remained. The district court declined to exercise supplemental jurisdiction over that claim, dismissing it without prejudice. The district court entered final judgment, and the Lowthers timely appealed.

## II.    DISCUSSION

We review de novo a district court's grant of summary judgment based on qualified immunity. *McInerney v. King*, 791 F.3d 1224, 1227 (10th Cir. 2015). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *McInerney*, 791 F.3d at 1227.

"When a defendant asserts the defense of qualified immunity, the onus is on the plaintiff to demonstrate (1) that the official conduct violated a statutory or constitutional right, *and* (2) that the right was clearly established at the time of the

challenged conduct." *A.M. v. Holmes*, 830 F.3d 1123, 1134 (10th Cir. 2016) (internal quotation marks omitted). If the plaintiff fails to make either showing, the defendant is entitled to qualified immunity. *Id.* at 1134–35.

For a right to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Mocek v. City of Albuquerque*, 813 F.3d 912, 922 (10th Cir. 2015) (quotation marks omitted). The Supreme Court has cautioned "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). The "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

Further, a "clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). If reasonable officers could disagree, the right is not clearly established. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The Lowthers challenge the district court's rulings on each of the claims outlined above. *See supra* Section I.B. We address those claims in turn, concluding the district court did not err.

20

### A.   Counts 1 & 10 – Warrantless Arrest

Dr. Lowther challenges the district court's conclusion that his warrantless arrest was justified by probable cause. We first address this challenge under the Fourth Amendment in Count 1, and then we consider this claim under the New Mexico Tort Claims Act in Count 10.

**1.   Count 1 – Fourth Amendment**

The Lowthers assert that when Dr. Lowther arrived home on August 30, 2017, the County Defendants violated the Fourth Amendment by arresting him without a warrant or probable cause. The County Defendants respond that Dr. Lowther was merely detained and that regardless, they had probable cause. For purposes of our analysis, we assume Dr. Lowther was arrested when he arrived home. Nonetheless, we conclude the County Defendants are entitled to qualified immunity because they had probable cause to believe Dr. Lowther had committed a crime.

The Fourth Amendment generally requires law enforcement officers to obtain a warrant before an arrest. *Oliver v. Woods*, 209 F.3d 1179, 1185–86 (10th Cir. 2000); *see also* U.S. Const. amend IV. A warrant is not necessary, however, if the officers have probable cause. *Oliver*, 209 F.3d at 1186. Probable cause exists if there is "reasonably trustworthy information that would lead a reasonable officer to believe" the arrestee "has committed or is about to commit a crime." *Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007) (en banc). Probable cause is an objective inquiry based on the totality of the circumstances. *Id.*

The district court concluded probable cause existed to arrest Dr. Lowther. In reaching this conclusion, the court relied on the following evidence: (1) "[Detective] Wootton had been presented with the contents of the CYFD Report, which included that A.L. had disclosed to [Ms.] DuBoise, in graphic detail, inappropriate sexual conduct with her father"; (2) Investigator Morales spoke to Ms. DuBoise and relayed that conversation to Detective Wootton; and (3) when Detective Wootton arrived at the Lowther home, he was briefed by the Deputies and Investigator Morales, who informed him the Lowthers "had been uncooperative." App. Vol. II at 504.

Considering the evidence in totality, we perceive no error in the district court's probable cause analysis—particularly given A.L.'s graphic disclosure. Nevertheless, the Lowthers argue probable cause was lacking because the County Defendants relied solely on the double-hearsay statement of a four-year-old. The Lowthers' argument rests on our decision in *Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007) (en banc).

In *Cortez*, a woman took her two-year-old daughter to the hospital "alleging that the child had complained that her babysitter's 'boyfriend' had 'hurt her pee pee.'" 478 F.3d at 1113 (footnote omitted). A nurse called the sheriff's department and reported the disclosure. *Id.* at 1112–13. Sheriff's deputies immediately went to the boyfriend's house. *Id.* at 1113. The deputies "did not wait to receive the results of the medical examination of the child, did not interview the child or her mother, and did not seek to obtain a warrant." *Id.* Moreover, they arrived at the home around 1:00

22

a.m., and when the boyfriend answered the door, the deputies seized, handcuffed, and Mirandized him before putting him in a patrol car and questioning him. *Id.*

We held that the deputies violated clearly established law because they did not have probable cause to arrest the boyfriend. *Id.* at 1116–22. We reached this conclusion because the deputies possessed only "a double-hearsay statement, allegedly derived from a two-year-old." *Id.* at 1122. Additionally, the deputies "conducted no investigation," even though "witnesses were readily available for interviews, physical evidence was available, and a medical diagnosis was forthcoming." *Id.* at 1117.

Like *Cortez*, this case involves the hearsay statement of a young child. But there are material differences. First, A.L. was four, not two, and her statement was more detailed than saying somebody "hurt her pee pee." *Id.* at 1113. A.L. described specific disturbing actions—she said Dr. Lowther "kisses her on the lips with tongue" and "touches her on her bottom and puts his finger inside of her." App. Vol. II at 492. A.L. also demonstrated "the movement with her hands and fingers." *Id.* at 492–93. She further reported that Dr. Lowther touched W.L. inappropriately and that Dr. Lowther told A.L. not to tell Mrs. Lowther. Additionally, the CYFD report noted that A.L. had been touching herself inappropriately at school.

The hearsay chain in this case is also different from *Cortez*. In *Cortez*, the nurse who reported the alleged abuse did not hear the allegations directly from the child. 478 F.3d at 1116. Conversely, Ms. DuBoise heard the allegations directly from A.L. and personally observed A.L.'s inappropriate behavior in class, as well as

23

A.L.'s hand motion demonstrating how Dr. Lowther touched her. Further, we emphasized in *Cortez* that depending on the circumstances, double hearsay could give rise to probable cause. *See id.* at 1118 n.10 ("No one disputes that hearsay (with sufficient indicia of reliability) may be considered as part of the totality of the circumstances in making a probable cause determination. The double-hearsay statement in this case could be considered; but it was insufficient, in and of itself, to support probable cause."); *id.* at 1118 n.11 ("Again, we do not suggest a per se rule that unsubstantiated double-hearsay can never give rise to probable cause. There, in fact, may be situations in which a double-hearsay statement involves individuals or circumstances of sufficient trustworthiness to give rise to probable cause."); *see also United States v. Mathis*, 357 F.3d 1200, 1205 (10th Cir. 2004) ("We restate that multiple layers of hearsay may form the basis of a finding of probable cause.").

This case also differs from *Cortez* because there were not additional witnesses or evidence readily available. *See Cortez*, 478 F.3d at 1117–19. The mother in *Cortez* reported the alleged abuse and took her child to the hospital for an examination. Thus, there was nothing to suggest she would impede further investigation. Additionally, the defendants could have interviewed the nurse who reported the alleged abuse and the doctor who examined the child, and they could have waited for the "forthcoming" medical diagnosis. *Id.* at 1117. In contrast, Mrs. Lowther would not allow the County Defendants inside the house, and she announced she did not take the allegations seriously. So, unlike the defendants in *Cortez*, the County Defendants did not have evidence or witnesses readily available. *See id.* at 1117–18.

24

In sum, A.L.'s detailed disclosure and her inappropriate behavior in class gave rise to probable cause to believe Dr. Lowther had committed a crime. Because Dr. Lowther has not shown a constitutional violation, the district court properly dismissed Count 1.

## 2.   Count 10 – New Mexico Tort Claims Act

The district court dismissed Count 10, relying on its conclusion that the County Defendants had probable cause to arrest Dr. Lowther. Although the Lowthers identify this as a ruling they challenge on appeal, they offer no argument for why the district court's ruling was incorrect. Thus, they waived any argument that the dismissal of Count 10 was erroneous, and we do not consider it further. *See Phillips v. Calhoun*, 956 F.2d 949, 954 (10th Cir. 1992) ("[E]ven issues designated for review are lost if they are not actually argued in the party's brief.").

### B.   Count 4 – Warrantless Entry

The Lowthers contend that Investigator Morales and the County Defendants violated the Fourth Amendment by entering their home without a warrant. They further contend the warrantless entry was not justified by exigent circumstances.[10]

---

[10] For the first time in their Reply Brief, the Lowthers cite *Kentucky v. King*, 563 U.S. 452 (2011), and argue the exigent circumstances exception cannot apply because the County Defendants "repeatedly threatened [Mrs. Lowther] with arrest or detention." Reply at 5. This argument is waived, so we do not consider it. *Anderson v. U.S. Dep't of Lab.*, 422 F.3d 1155, 1174 (10th Cir. 2005) ("The failure to raise an issue in an opening brief waives that issue."). But we assume for purposes of our analysis that Mrs. Lowther did not voluntarily consent to entry.

Assuming the warrantless entry violated the Fourth Amendment, we nonetheless affirm the district court because the violation was not clearly established.

We begin by concluding that although Investigator Morales is not a law enforcement officer, she may be liable for the warrantless entry. Next, we reject the Lowthers' argument that the County Defendants waived their exigency defense. We then outline our precedent concerning exigent circumstances under the Fourth and Fourteenth Amendments. As we explain, this precedent creates some ambiguity about how to evaluate exigency in child welfare cases. We thus conclude that even if the County Defendants violated the Fourth Amendment, the violation was not clearly established.

### 1.    Investigator Morales

Investigator Morales contends that because she is not a law enforcement officer, she could not have obtained a search warrant and was thus entitled to "rely on law enforcement's judgment to enter the Lowthers' home." CYFD Br. at 25. Consequently, she argues she cannot be liable for an unlawful entry. We disagree.

The Fourth Amendment "provides that the Government shall not violate '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1204 (10th Cir. 2003) (alteration in original) (quoting U.S. Const. amend. IV). Thus, the "Fourth Amendment protects the right of the people to be 'secure in their persons' from government intrusion, whether the threat to privacy arises from a policeman or

a Head Start administrator." *Id.* at 1205. "There is no 'social worker' exception to the Fourth Amendment." *Id.*

Investigator Morales does not distinguish this case from others where we have declined to recognize a social worker exception to the Fourth Amendment. *See id.*; *see also Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1242 (10th Cir. 2003) ("[T]he state's interest in protecting children does not excuse social workers from the warrant requirement of the Fourth Amendment."). We thus reject her argument that she cannot be liable for an unlawful entry.

**2.    Waiver**

The Lowthers argue the County Defendants waived their exigency defense by not raising it in their Motion for Partial Summary Judgment. Although the parties dispute this point, we assume the County Defendants did not raise exigency in their Motion for Partial Summary Judgment. Even so, the Lowthers had an opportunity to oppose the exigency defense, so the district court was not prohibited from considering it.

"Our case law forbids the district court from relying on new arguments or materials to decide a summary judgment motion unless the opposing party is provided an opportunity to respond." *Geddes v. United Staffing All. Emp. Med. Plan*, 469 F.3d 919, 928 (10th Cir. 2006). Before the district court, the Lowthers had two opportunities to respond to the exigency defense.

First, the Lowthers responded to the County Defendants' Motion for Partial Summary Judgment by filing a combined Response and Cross-Motion for Partial

27

Summary Judgment. The County Defendants' Response to this Cross-Motion expressly raised exigency as a defense to the unlawful entry claim. The Lowthers filed a Reply to this Response, wherein they could have addressed exigency. Second, the district court originally ruled that the exigency defense was waived, and the County Defendants filed a Rule 59(e) Motion asking the court to reconsider. The Lowthers responded to the Rule 59(e) Motion, arguing both that the exigent circumstances exception had been waived and that it was inapplicable.

The exigent circumstances exception was fully briefed before the district court, and the Lowthers had a fair opportunity to address it. As a result, it was not improper for the district court to consider exigent circumstances. *Geddes*, 469 F.3d at 928; *cf. Stewart v. City of Oklahoma City*, 47 F.4th 1125, 1132 (10th Cir. 2022) ("Furthermore, we may affirm a grant of summary judgment on grounds other than those relied on by the district court when the record contains an adequate and independent basis for the result." (internal quotation marks omitted)).

3.    **Exigent Circumstances**

Although the warrantless entry claim is brought under the Fourth Amendment, the Fourteenth Amendment is relevant to our analysis because the parties dispute whether the Fourth and Fourteenth Amendment exigency standards are identical. Investigator Morales and the County Defendants argue the standards are

28

indistinguishable, while the Lowthers contend the Fourth Amendment standard is narrower.

As we now explain, our precedent is unclear concerning the applicable exigency standards under the Fourth and Fourteenth Amendments in child welfare cases. We next consider how, because of this ambiguity, it was not clearly established that the warrantless entry here violated the Fourth Amendment.

### a.    Tenth Circuit precedent

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)). However, a warrant is not required when exigent circumstances are present. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Id.* This type of exigency exists when officials "have objectively reasonable grounds to believe that there is an immediate need to protect their lives or others." *Cortez*, 478 F.3d at 1124. Under these circumstances, officials "do not need probable cause." *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1070 (10th Cir. 2010); *see also Cortez*, 478 F.3d at 1124 n.21 (noting that *Brigham City v. Stuart*, 547 U.S. 398 (2006), "did not expressly require probable cause" for there to be exigent circumstances).

Under the Fourteenth Amendment, the state may not permanently sever parental rights or temporarily remove children from a home "without affording the

parents due process of law." *Arredondo v. Locklear*, 462 F.3d 1292, 1298 (10th Cir. 2006). Due process typically requires "notice and an opportunity to be heard *before* state officials remove children from the home." *Id.* But when "[f]aced with emergency circumstances which pose an immediate threat to the safety of a child, the state may temporarily deprive a parent of custody without parental consent or a court order." *Id.* (internal quotation marks omitted).

Investigator Morales and the County Defendants argue that under both the Fourth and Fourteenth Amendments, exigent circumstances exist when there is reasonable suspicion that a "child has been abused or is in imminent peril of abuse." County Br. at 21 (quoting *Arredondo*, 462 F.3d at 1298). The Lowthers disagree. They contend the standards are different and that the Fourth Amendment "requires [a] reasonable basis to believe a child is in imminent danger of death or serious physical injury." Appellants' Br. at 32. Put differently, they contend there must be imminent danger, not just past abuse.

The disagreement between the parties stems from our precedent considering exigent circumstances in the child welfare context.

i.　*Roska ex rel. Roska v. Peterson*

In *Roska ex rel. Roska v. Peterson*, school employees suspected a student was being abused by his mother. 328 F.3d 1230, 1237–38 (10th Cir. 2003). The employees told a social worker they were worried the student "might die" without intervention. *Id.* at 1238. Two days later, social workers and a police officer entered the mother's home without a warrant and removed the student without judicial

authorization. *Id.* The student and his family sued the social workers and other state actors under § 1983 for various violations of the Fourth and Fourteenth Amendments. *Id.* at 1239. The district court dismissed all claims based on qualified immunity. *Id.*

On appeal, we considered whether exigent circumstances justified the warrantless entry. *Id.* at 1240–41. Under the Fourth Amendment, we concluded there was not an exigency because there was "no evidence" indicating the student "was in *immediate* threat of death or severe physical harm." *Id.* at 1241 (emphasis added). Turning to the second prong of the qualified immunity analysis, however, we concluded the law was not clearly established at the time of the violation because our Fourth Amendment precedent had incorrectly suggested the risk to the child's safety need not be immediate. *Id.* at 1249–50 & nn.23–24. But we clarified that for future cases, "absent probable cause and a warrant or exigent circumstances, social workers may not enter an individual's home for the purpose of taking a child into protective custody." *Id.* at 1250 n.23. We further instructed that the exigent circumstances exception cannot apply if the risk to the child's safety is "not immediate." *Id.* at 1250 n.24.

We next considered whether the student's removal without judicial authorization violated the Fourteenth Amendment. *Id.* at 1245–46. We explained that notice and a hearing are not required before a removal if there are "emergency circumstances which pose an immediate threat to the safety of a child." *Id.* at 1245 (quotation marks omitted). Because emergency circumstances were not present before the student's removal, we concluded there had been a violation of the

31

Fourteenth Amendment. *Id.* at 1246. Moreover, we determined this violation was clearly established because the student's "health and safety were not in immediate danger." *Id.* at 1250.

In sum, *Roska* required evidence of imminent danger under both the Fourth and Fourteenth Amendments. *Id.* at 1241, 1245. But *Roska* did not consider possible differences between the Fourth and Fourteenth Amendment standards.

      ii.     <u>*Gomes v. Wood*</u>

In *Gomes v. Wood*, a mother took her nine-month-old daughter to the pediatrician, claiming the daughter had a skull fracture from falling off a bed. 451 F.3d 1122, 1124 (10th Cir. 2006). The pediatrician found this explanation "possible but suspicious." *Id.* And although he "was comfortable" sending the daughter home, he told the mother he would have to report the injury. *Id.* at 1125. Several days later, a caseworker removed the daughter from the mother's home without a court order. *Id.* at 1126.

The mother sued the caseworker and others under § 1983. *Id.* She asserted the defendants violated the Fourteenth Amendment by removing her daughter without prior notice and hearing. *Id.* The district court granted summary judgment to the defendants on all claims. *Id.* at 1126. We affirmed based on qualified immunity, concluding the law was not clearly established. *Id.* at 1135–38.

We began by explaining that a child may be removed without prior notice and a hearing if there are "[e]mergency circumstances which pose an immediate threat to the safety of a child." *Id.* at 1128 (alteration in original) (quotation marks omitted).

32

However, we acknowledged there is no "precise definition of emergency circumstances which pose an immediate threat to the safety of a child." *Id.* (quotation marks omitted). We thus considered caselaw from our sister circuits. *Id.* at 1129–30. We quoted the First Circuit as noting that "a majority of circuits addressing this issue have held that 'a case worker . . . may place a child in temporary custody when he has evidence giving rise to a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse.'" *Id.* at 1129 (alteration in original) (quoting *Hatch v. Dep't for Children, Youth, & Their Families*, 274 F.3d 12, 20 (1st Cir. 2001)). We then acknowledged that the Ninth and Eleventh Circuits require "reasonable or probable cause of imminent danger." *Id.*

Ultimately, we decided to follow "the majority approach" and concluded "that state officials may remove a child from the home without prior notice and a hearing when they have a reasonable suspicion of an immediate threat to the safety of the child if he or she is allowed to remain there." *Id.* at 1130. Although we stated we were adopting "the majority approach"—which appears to require only reasonable suspicion "the child has been abused," *id.* at 1129 (quoting *Hatch*, 274 F.3d at 20)— the standard we articulated required "a reasonable suspicion of an immediate threat to the safety of the child," *id.* at 1130.

Turning back to the merits, we held there was a genuine dispute whether the defendants had reasonable suspicion to remove the daughter without a hearing. *Id.* at 1135. However, the law was not clearly established because "a reasonable official could have believed that there was an immediate threat" to the daughter's safety that

33

justified her removal without a hearing. *Id.* at 1137. Thus, the defendants were entitled to qualified immunity. *Id.* at 1138.

### iii. *Arredondo v. Locklear*

In *Arredondo v. Locklear*, a mother took her eleven-month-old daughter, Jasmine, to the emergency room with a fractured arm. 462 F.3d 1292, 1294 (10th Cir. 2006). The mother gave an inconsistent and confusing explanation for the arm fracture. *Id.* Additionally, the mother returned to the emergency room four days later because Jasmine could not put weight on her leg. *Id.* at 1295. Based on the two serious injuries and the "conflicting stories," hospital staff reported the mother to the state's family division, which coded the report as a non-emergency. *Id.*

A social worker and a detective went to the family's home where they spoke to the mother and inspected the home. *Id.* The detective removed Jasmine immediately based on the two injuries and because he thought the mother's explanation for the injuries was conflicting and unlikely. *Id.* The detective also wanted to remove Jasmine's older sister, Ashley, from the home. *Id.* Ashley showed no signs of abuse or injury, but the detective was worried she would become a target of abuse once Jasmine was gone. *Id.* at 1295–96. The social worker believed there was no threat to Ashley and refused to take her into custody. *Id.* at 1296. The next day, however, the social worker removed Ashley from her home after conferring with other social workers. *Id.*

Jasmine and Ashley's parents sued under § 1983, asserting the removal of the children without judicial authorization violated the Fourteenth Amendment. *Id.* at

34

1297. The district court granted summary judgment to the defendants based on qualified immunity, and we affirmed. *Id.* at 1297, 1302. On appeal, we explained that under *Gomes*, the state may remove a child without notice and a hearing if there is "evidence giving rise to a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse." *Id.* at 1298 (quotation marks omitted). We then concluded that "the evidence available to state officials was sufficient to create a reasonable suspicion that Jasmine had been abused, and that Ashley was in imminent peril of abuse." *Id.* at 1299. Concerning Jasmine, we stated the defendants "had ample evidence" she "had been abused or was in imminent danger of abuse," emphasizing that within four days she suffered two injuries that required emergency care. *Id.* We also explained that a "team of social workers" agreed Jasmine was "in immediate danger of harm." *Id.* at 1300. For these reasons, we held there was no Fourteenth Amendment violation and did not consider whether the law was clearly established. *Id.* at 1302.

> iv.    *Silvan W. v. Briggs*

In *Silvan W. v. Briggs*, a teenager was sexually assaulted by her brother-in-law.[11] 309 F. App'x 216, 219 (10th Cir. 2009) (unpublished). The teenager's mother

---

[11] Because *Silvan W. v. Briggs*, 309 F. App'x 216 (10th Cir. 2009), is unpublished, it cannot clearly establish the law. *Green v. Post*, 574 F.3d 1294, 1305 n.10 (10th Cir. 2009). But we may consider it when deciding the state of our law. *See Morris v. Noe*, 672 F.3d 1185, 1197 n.5 (10th Cir. 2012) ("But we have never held that a district court must ignore unpublished opinions in deciding whether the law is clearly established.").

reported the assault but also "hooked [the brother-in-law] up with a lawyer," encouraged the teenager to be forgiving, and allowed the brother-in-law in the family's home after the assault. *Id.* Concerned for the teenager's safety, police took her into custody without a warrant or hearing. *Id.* at 220. The family brought a § 1983 action against state officials, asserting Fourth and Fourteenth Amendment claims. *Id.* at 220–21. The district court granted summary judgment to the defendants, and we affirmed based on qualified immunity. *Id.* at 221, 226.

We addressed the Fourteenth Amendment claim first, citing the standard from *Arredondo*—"state officials must have evidence giving rise to a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse." *Id.* at 222 (quotation marks omitted). We concluded there was reasonable suspicion that the teenager "had been abused and was in imminent peril of further abuse" because the mother did not appreciate the seriousness of the assault, stated "that the [brother-in-law] was somehow a victim," encouraged the teenager to be forgiving, did not like law enforcement "going after" the brother-in-law, hired an attorney for the brother-in-law, and did not want the teenager to testify. *Id.* at 223.

We then briefly addressed the Fourth Amendment claim and explained that "[a]n *immediate* risk to [the child's] safety would give rise to exigent circumstances." *Id.* at 224 (second alteration in original) (internal quotation marks omitted). For the reasons "already expressed," we concluded that exigent circumstances justified the teenager's removal. *Id.*

v.    *Halley v. Huckaby*

In *Halley v. Huckaby*, the state received an anonymous call from somebody concerned about the safety of a six-year-old boy.[12] 902 F.3d 1136, 1142 (10th Cir. 2018). A police officer—without judicial authorization—removed the boy from school and took him to a safehouse for an interview. *Id.* at 1142–43, 1147. The interview did not reveal any evidence of abuse, so the boy was taken back to school, and there was no further investigation. *Id.* at 1143.

The boy sued the deputy and several state employees under § 1983, alleging they violated his Fourth Amendment rights.[13] *Id.* The parties agreed that under the Fourth Amendment, the officials needed "reasonable suspicion of imminent abuse in order to seize [the boy]." *Id.* at 1146. With this in mind, we held "that a reasonable officer in possession of the facts could not have had reasonable suspicion that [the boy] was in imminent danger." *Id.* We therefore held that by seizing the boy, two of the defendants violated clearly established law.[14] *Id.* at 1151.

---

[12] *Halley v. Huckaby*, 902 F.3d 1136 (10th Cir. 2018), was decided after the events of this case, so it could not have clearly established the law. But we discuss it because it helps demonstrate some of the uncertainty in our precedent.

[13] The boy also brought a Fourteenth Amendment claim, but that claim was based on substantive due process, so it is not relevant here. *Id.* at 1153–58.

[14] A third defendant did not violate clearly established law because he merely relied on other officials' instructions "without conducting his own investigation." *Halley*, 902 F.3d at 1150.

In reaching that conclusion, we noted the parties had cited *Gomes*. *Id.* at 1146 n.3. Although "*Gomes* is not a Fourth Amendment case," we acknowledged that "its holding hews close to Fourth Amendment doctrine, and is therefore instructive." *Id.*

  vi.  Summary

Our decision in *Roska* required an "immediate threat" of harm under both the Fourth and Fourteenth Amendments.[15] 328 F.3d at 1241, 1245. This is consistent with Fourth and Fourteenth Amendment caselaw requiring an imminent threat of harm to support exigent circumstances. *See Brigham City*, 547 U.S. at 403 (explaining that under the Fourth Amendment, officials "may enter a home without a warrant . . . to protect an occupant from imminent injury"); *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997) (explaining that under the Fourteenth Amendment, "officials may temporarily deprive a parent of custody without" judicial authorization "in emergency circumstances which pose an immediate threat to the safety of a child"). These decisions are consistent with the concept that, by definition, circumstances

---

[15] Our precedent uses different phrasing when describing the required imminent threat. For example, "threat of imminent abuse," *Halley*, 902 F.3d at 1146 (Fourth Amendment); "imminent peril of abuse," *Gomes v. Wood*, 451 F.3d 1122, 1129 (10th Cir. 2006) (quoting *Hatch v. Dep't for Children, Youth, & Their Families*, 274 F.3d 12, 20 (1st Cir. 2001)) (Fourteenth Amendment); "immediate threat of death or severe physical harm," *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1241 (10th Cir. 2003) (Fourth Amendment); "immediate threat to the safety of a child," *Hollingsworth*, 110 F.3d at 739 (Fourteenth Amendment). These differences are not material because, at bottom, all require an imminent threat of harm. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (holding that "law enforcement officers may enter a home without a warrant . . . to protect an occupant from imminent injury").

qualify as "exigent" only if there is a need for "immediate action." *Exigency*, *Black's Law Dictionary* (11th ed. 2019).

*Gomes*, however, injected some ambiguity into our precedent. There, we stated the Fourteenth Amendment requires "a reasonable suspicion of an *immediate* threat to the safety of the child if he or she is allowed to remain" at home. 451 F.3d at 1130 (emphasis added). But we also purported to adopt an approach that requires only "a reasonable and articulable suspicion that the child has been abused *or* is in imminent peril of abuse." *Id.* at 1129 (emphasis added) (quoting *Hatch*, 274 F.3d at 20). The disjunctive phrasing in "has been abused *or* is in imminent peril of abuse" suggests an imminent threat of harm is not required. *Id.*; *cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 116 (2012) (explaining that "*or* creates alternatives"). *Arredondo* and *Silvan W.* contributed to the ambiguity by similarly articulating the standard to require that the child "has been abused or is in imminent peril of abuse." *Arredondo*, 462 F.3d at 1298 (quotation marks omitted); *Silvan W.*, 309 F. App'x at 222 (quotation marks omitted). Given the disjunctive phrasing, reasonable officials could have concluded that under the Fourteenth Amendment, exigent circumstances were present if there was reasonable suspicion of past abuse, even in the absence of reasonable suspicion of imminent harm.

Reasonable officials could have also translated this incorrect understanding to the Fourth Amendment. Granted, *Gomes* and *Arredondo* considered only Fourteenth Amendment claims. *Gomes*, 451 F.3d at 1126; *Arredondo*, 462 F.3d at 1297. And *Silvan W.* did not cite *Gomes* or *Arredondo* in its analysis under the Fourth

Amendment. *Silvan W.*, 309 F. App'x at 224. However, we have never held that the Fourth and Fourteenth Amendments have different exigency requirements. Instead, we have suggested the standards are alike. *Cf. Halley*, 902 F.3d at 1146 n.3 (noting that *Gomes*'s "holding hews close to Fourth Amendment doctrine, and is therefore instructive"). A reasonable official could conclude that if one set of facts constituted an exigency under the Fourteenth Amendment, those same facts also constituted an exigency under the Fourth Amendment. Indeed, requiring separate analyses under each Amendment would be wholly impracticable.

Because the disjunctive phrasing in *Gomes* is unclear, we take this opportunity to clarify our precedent. Although *Gomes*, *Arredondo*, and *Silvan W.* may reasonably be read as not requiring a threat of imminent harm, that reading is divorced from the context of the standard. *Gomes* adopted the phrasing "has been abused or is in imminent peril of abuse" as a definition of "emergency circumstances which pose an *immediate* threat to the safety of a child." 451 F.3d at 1128–29 (emphasis added) (quotation marks omitted). And *Gomes*, *Arredondo*, and *Silvan W.* still considered whether there was a threat of imminent harm despite evidence of past abuse. *See Gomes*, 451 F.3d at 1135 (evaluating whether the caseworker "had a reasonable suspicion of emergency circumstances which pose an immediate threat to the safety of a child" (internal quotation marks omitted)); *Arredondo*, 462 F.3d at 1299–1300 (considering the child's recent and serious injuries, as well as social worker concerns that the child "was still in immediate danger of harm"); *Silvan W.*, 309 F. App'x at

222–23 (concluding there was reasonable suspicion the teenager "had been abused and was in imminent peril of further abuse").

To be sure, evidence of past abuse may demonstrate a threat of imminent harm, but it will not always do so. Factors important to assessing the risk of imminent harm include, but are not limited to, the strength of the evidence indicating prior abuse, the severity of the prior abuse, the temporal proximity to the prior abuse, the identity of the alleged abuser, the alleged abuser's access to the child, and whether there is time to obtain a warrant or judicial authorization. *See Halley*, 902 F.3d at 1146–47; *Silvan W.*, 309 F. App'x at 222–23; *Arredondo*, 462 F.3d at 1299–1302; *Gomes*, 451 F.3d at 1135; *Roska*, 328 F.3d at 1240–41. For the circumstances to justify warrantless entry and seizure based on exigent circumstances, there must be a threat of imminent harm under both the Fourth and Fourteenth Amendments. Careful review reveals that our decisions do not depart from that requirement in application, even when using the disjunctive "or" in stating the standard. *See Gomes*, 451 F.3d at 1129, 1135. Today we clarify that even in the child welfare context, there must be a threat of imminent harm when officials enter a home or seize children without a warrant or judicial authorization.[16]

---

[16] In *Gomes*, we adopted a reasonable suspicion standard for evaluating child removals under the Fourteenth Amendment. 451 F.3d at 1130. But under the Fourth Amendment, the Supreme Court requires an "objectively *reasonable basis* for believing that an occupant is seriously injured or imminently threatened with such injury." *Brigham* City, 547 U.S. at 400 (emphasis added). We have held that "reasonable basis" is "more lenient than the probable cause standard." *United States v. Porter*, 594 F.3d 1251, 1258 (10th Cir. 2010). However, we have not yet

41

Nevertheless, Defendants here did not have the benefit of this clarification. Accordingly, they could have reasonably, but incorrectly, believed that under the Fourth and Fourteenth Amendments, exigent circumstances were present if there was reasonable suspicion of past abuse, even in the absence of imminent harm. This means Defendants did not violate clearly established law so long as they had reasonable suspicion of past abuse. *See Malley*, 475 U.S. at 341 (holding a right is not clearly established if reasonable officers could disagree over it). We now consider whether they had such suspicion.

b. *Defendants' warrantless entry*

When Investigator Morales and the County Defendants entered the Lowther home, they had probable cause to believe that Dr. Lowther had abused A.L. *See supra* Section II.A.1. Therefore, they also had reasonable suspicion A.L. had been abused. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (explaining that "'reasonable suspicion' is a less demanding standard than probable cause").

Yet, the Lowthers argue there could not have been an exigency because Dr. Lowther was detained outside the home and was thus unable to harm the children. But as explained, the County Defendants could have reasonably believed that

considered whether the "reasonable basis" standard from *Brigham City* is equivalent to reasonable suspicion. Nor did the parties here ask us to answer that question. Moreover, concerning the Second Removal, we conclude Investigator Morales and Ms. Miles had both reasonable suspicion and a reasonable basis for believing the children were in imminent danger. *See infra* Section II.D. Accordingly, it is unnecessary to decide today whether reasonable basis and reasonable suspicion are identical standards.

reasonable suspicion of past abuse justified the warrantless entry, even when further abuse was not imminent.

Based on our precedent, a reasonable investigator or officer could reasonably believe warrantless entry was justified by reasonable suspicion of past abuse. Thus, Investigator Morales and the County Defendants did not violate clearly established Fourth Amendment law. Accordingly, we affirm the district court's ruling that Investigator Morales and the County Defendants are entitled to qualified immunity on Count 4.

### C.    Counts 5 & 12 – First Removal

The Lowthers assert that the First Removal violated the Fourth and Fourteenth Amendments, and the New Mexico Tort Claims Act. We address the constitutional claims first and then the state law claim.[17]

### 1.    Count 5 – Fourth and Fourteenth Amendments

The Lowthers assert the First Removal violated the Fourth and Fourteenth Amendments because Investigator Morales and Detective Wootton did not have "a warrant or reasonable suspicion the children were in imminent danger." App. Vol. II at 571. We conclude that Investigator Morales and Detective Wootton are entitled to

---

[17] Investigator Morales contends she cannot be liable for the First Removal because BCSO decided to remove the children and she did not have "decision-making authority." CYFD Br. at 27. We need not address this argument because we affirm the dismissal of Counts 5 and 12 on other grounds.

qualified immunity on Count 5 because they reasonably suspected A.L. had been abused.

Recall that under the Fourth Amendment, seizures without a warrant are presumptively unreasonable. *Payton*, 445 U.S. at 586. Similarly, the Fourteenth Amendment typically requires judicial authorization before children are removed. *Arredondo*, 462 F.3d at 1298. However, the Fourth and Fourteenth Amendments both incorporate an exception for exigent circumstances. *Brigham City*, 547 U.S. at 403; *Arredondo*, 462 F.3d at 1298. And because our relevant precedent was unclear, Defendants could have reasonably believed that exigent circumstances were present under the Fourth and Fourteenth Amendment if there was reasonable suspicion of past abuse. *See supra* Section II.B.3.a.vi.

When Investigator Morales and Detective Wootton seized the children on August 30, 2017, they had the same information as when they entered the home earlier that afternoon. And we have already concluded that the available information supported a reasonable suspicion a child had been abused. *See supra* Section II.B.3.b. Thus, Investigator Morales and Detective Wootton could have reasonably believed the First Removal was justified by exigent circumstances, and the Lowthers have not shown a violation of clearly established law.

The Lowthers, however, argue that *Roska* demonstrates the First Removal clearly violated the Fourth Amendment. *Roska* did not clearly establish a violation here for two reasons. First, as explained, *Roska* was decided before our precedent created uncertainty about how to evaluate exigency. Second, the facts are not

44

comparable—*Roska* did not involve a graphic disclosure, accompanied by hand gestures, from a child who was touching herself inappropriately. *See Roska*, 328 F.3d at 1237–39. Because of these differences, *Roska* did not clearly establish a violation here. *See Saucier*, 533 U.S. at 201.

The Lowthers also urge us "to focus on the fact that under the novel facts of this case, Detective Wootton and Investigator Morales had ample opportunity to obtain a warrant prior to removing the children from their home, without jeopardizing the children's safety." Appellants' Br. at 33. They contend there was "ample opportunity to obtain a warrant" for the removal because BCSO was able to obtain a search warrant for the Lowthers' home later that night. *Id.*

We have held that an "important consideration" when evaluating exigency is "whether state officials had time to seek and obtain judicial authorization for the removal without jeopardizing the safety of the child." *Gomes*, 451 F.3d at 1131. Still, this factor is not "necessarily dispositive." *Id.*; *see also Arredondo*, 462 F.3d at 1300. And "[i]n many instances, it may not be entirely clear either how long it would take to obtain judicial approval or whether this period of delay would jeopardize the safety of the child." *Gomes*, 451 F.3d at 1130.

Investigator Morales and Detective Wootton argue that a "seizure warrant" for child removals does not exist and that it is unclear how much time they would have needed to obtain judicial authorization. CYFD Br. at 7. As Detective Wootton explains, obtaining judicial authorization can take "an unpredictable amount of time" and "requires CYFD to file a petition for an ex parte custody order with the

45

children's court." County Br. at 37; *see also* N.M. Stat. § 32A-4-4 (providing CYFD

with authority to file an ex parte custody petition); App. Vol. VII at 1726 (Deposition

of Ms. Meade, CYFD Investigations supervisor) ("So we don't do warrants, and we

would have gotten an ex parte if we could have been assured that they would be safe

while obtaining the ex parte."). In this case, for example, CYFD submitted an ex

parte custody petition on September 8, 2017, but the court did not file an ex parte

custody order until September 13, 2017. The Lowthers do not cite any contrary

authority that establishes Defendants could have obtained a warrant for the removal.

Nor do they provide evidence of how much time such a warrant would take.

For these reasons, Investigator Morales and Detective Wootton could have

reasonably believed there were exigent circumstances that justified removing the

children without judicial authorization. We thus affirm the district court's ruling that

Investigator Morales and Detective Wootton are entitled to qualified immunity on

Count 5.

**2.    Count 12 – New Mexico Tort Claims Act**

The district court dismissed Count 12 because there was "reasonable suspicion

to place the Lowther children in state custody" and because the Lowthers failed to

provide a "substantive argument." App. Vol. III at 699. The Lowthers identify this as

a ruling they challenge on appeal, but they provide no relevant analysis. As a result,

46

they waived any challenge to the district court's dismissal of Count 12. *See Phillips*, 956 F.2d at 954.

### D.    *Count 6 – Second Removal*

The Lowthers assert that Investigator Morales and Ms. Miles violated the Fourth and Fourteenth Amendments by removing the children "without a warrant or reasonable suspicion the children were in imminent danger." App. Vol. II at 572. But considering the totality of the evidence, Investigator Morales and Ms. Miles had a reasonable basis for believing and reasonable suspicion that the children were in imminent danger of harm at the time of the Second Removal. They are therefore entitled to qualified immunity.[18]

First, Investigator Morales and Ms. Miles had the same information available at the time of the First Removal. They knew that A.L. had been touching herself inappropriately in class and had made a graphic disclosure to Ms. DuBoise. Moreover, there was new information corroborating A.L.'s disclosure. In her forensic interview, for example, A.L. stated that her father "takes photographs and videos of her 'butt and gina.'" App. Vol. II at 499. W.L. also made concerning statements, namely that he and A.L. "are slapped across the face" and that "his father pushes him 'hard down on the ground' which causes him to hit the back of his head." *Id.* Further,

---

[18] Investigator Morales and Ms. Miles contend they cannot be liable for the Second Removal because there is no evidence they "had decision-making authority . . . or that they actually made the decision to remove the children." CYFD Br. at 27. We need not address this argument because we affirm the dismissal of Count 6 on other grounds.

Dr. Nienow documented that during A.L.'s SANE exam, "an injury was noted at 12 o'clock on the anus" that "appeared consistent with tearing and/or bruising."[19] App. Vol. III at 811.

Next, Mr. Borg approached Ms. Miles at the criminal hearing and "angrily expressed his disbelief" of the allegations against Dr. Lowther. App. Vol. IV at 1055. Mr. Borg's behavior indicated the Borgs could not remain neutral. The Lowthers, however, argue that the children were not in danger just because Mr. Borg refused "to accept as true an unproven allegation of the most egregious type." Reply at 18. This argument misses the point. Mr. Borg was not required to believe that Dr. Lowther abused A.L. and W.L. But Mr. Borg was required to remain neutral, and his behavior at the criminal hearing indicated he was not.

Finally, Investigator Morales and Ms. Miles knew that Dr. Lowther was going to be released from jail and that he and Mrs. Lowther had "discussed leaving town with the children." App. Vol. IV at 1055. Investigator Morales and Ms. Miles also knew that the assistant district attorney had "expressed concerns regarding Dr. Lowther's potential access to the Lowther children via his influence over [Mrs.] Lowther and her parents." *Id.* at 1054–55.

---

[19] The Lowthers contend the children's interviews and A.L.'s medical exam "are irrelevant to the central claims in this case." Appellants' Br. at 10 n.1. In support, they cite a letter written by a deputy district attorney, which they characterize as "a scathing declination" of the investigation of Dr. Lowther. *Id.* at 9 n.1. We do not consider the letter because it was written after the Second Removal and thus could not have factored into the decision to remove the children.

Considering the totality of the circumstances—specifically, the evidence of past abuse, the results of the children's interviews and A.L.'s physical examination, Mr. Borg's behavior at the criminal hearing, Dr. Lowther's impending release from jail, and the Lowthers' discussions indicating they planned to abscond with the children—Investigator Morales and Ms. Miles had reasonable suspicion the children were in immediate danger. Thus, the remaining question is whether Investigator Morales and Ms. Miles also had "an objectively reasonable basis for believing" the children were in imminent danger. *See Brigham City*, 547 U.S. at 400 (stating Fourth Amendment standard). Although we have not decided whether "objectively reasonable basis for believing" and reasonable suspicion are the same standard, *see supra* note 16, we have held that "[r]easonable belief" is "more lenient than the probable cause standard," *United States v. Porter*, 594 F.3d 1251, 1258 (10th Cir. 2010). With that in mind, we have no trouble concluding Investigator Morales and Ms. Miles had an objectively reasonable basis for believing the children were in imminent danger, for the same reasons they had reasonable suspicion. We thus need not determine whether "objectively reasonable basis for believing" and reasonable suspicion are equivalent standards. Under either framing, Investigator Morales and Ms. Miles acted reasonably.

Nonetheless, the Lowthers point to Ms. Miles's statement after the criminal hearing that she did not think the children were in imminent danger. Ms. Miles's subjective beliefs are not relevant, however, because reasonableness is an objective,

49

not a subjective, inquiry.[20] *Brigham* City, 547 U.S. at 404; *see also Arredondo*, 462 F.3d at 1300 (explaining that a defendant's "subjective belief that the situation was not an 'emergency' does not change the fact that the [d]efendants had an objectively reasonable basis to suspect that [a child] had been abused or faced imminent peril of abuse").

The Lowthers also argue that if the children had been in imminent danger of harm, they would have been removed right after the criminal hearing. Although the children were not removed immediately after the hearing, they were removed within twenty-four hours of the hearing. And more importantly, they were removed before Dr. Lowther was released from jail, thus addressing concerns that Dr. Lowther would have access to or abscond with the children.

For the foregoing reasons, Investigator Morales and Ms. Miles acted reasonably. Accordingly, the Lowthers failed to show that the Second Removal violated the Fourth or Fourteenth Amendments. The district court properly dismissed Count 6 based on qualified immunity.

---

[20] The Lowthers cite cases where we considered a non-party's statement that a child was not in imminent danger. *See Roska*, 328 F.3d at 1241 (considering that the child's "attending physician stated on the phone that it would be a mistake to remove him from the home"); *Gomes*, 451 F.3d at 1135 (considering doctor's report that he was "comfortable" sending a child home). But we did not consider these statements for the purpose of evaluating the defendants' subjective beliefs. Rather, we considered the non-party statements because the subjective opinions of the non-parties constituted evidence available to the defendants. These cases are thus inapposite.

## III.     CONCLUSION

The Lowthers have not shown any error in the district court's summary judgment rulings. We thus AFFIRM.